### THE LYMAN M. LAW.

#### (District Court, D. Maine. May 7, 1903.)

#### No. 56.

**1. SALVAGE—RESCUE OF ABANDONED SCHOONER—AMOUNT OF COMPENSATION.**

The Lyman M. Law, a large, deeply laden coal schooner, was anchored off the shore of Cape Cod in the winter in a sinking condition, abandoned by her crew, and with her pumps unable to reduce the water in her hold. Passing steamers had paid no attention to her signals, and one refused to render any salvage service, but took off her crew, with their effects. After lying through the night, during which she had filled above the deck forward, the North Star, a large passenger steamer, on her regular trip from New York to Portland, the schooner Hope Sherwood, and the crew from the life station went to the rescue of the Law, and by 10 that night she had been towed by the steamer into a port. With her cargo and freight she was of the value of $36,000. The risk to the men from the two crews and the life-savers who went on board and remained to steer and work the pumps was considerable, as she was in danger of sinking at any time, and there was also danger that the North Star, which was not fitted for towing, might be disabled by the fouling of her propeller, owing to the unmanageable condition of the Law. The Sherwood, besides the services rendered by her crew, stood by during all the time to give any assistance needed. The North Star, with her cargo and freight, was of the value of about $460,000. The services were skillfully performed, and the Law and her cargo were saved without loss. *Held,* that $12,000 would be awarded as salvage, $9,500 to the North Star and crew, and $2,500 to the Hope Sherwood and crew.

In Admiralty. Suit to recover for salvage services.

Benj. Thompson, for the Maine Steamship Co.

Frederic Dodge, for the Hope Sherwood.

Carver & Blodgett and James D. Dewell, Jr., for the Lyman M. Law.

Bird & Bradley, for S. D. Warren & Co., claimants for cargo.

HALE, District Judge. On Sunday morning, February 1, 1903, the four-masted schooner Lyman M. Law, of New Haven, Conn., of the burden of 1,154 tons net, with a cargo of 1,935 tons of Pocahontas coal, was lying at anchor about halfway between Nauset and Chatham lights, off the coast of Cape Cod, between two and three miles from the beach, with both anchors down, in about 20 fathoms of water, and with no crew on board. She had cleared at Norfolk, Va., on a voyage to Portland, Me., carrying a crew of 11 men all told, namely, Capt. John E. Blake, master, a mate, second mate, steward, engineer, and six men before the mast. She was fitted with a boiler and engine located near the bow for hoisting sail, weighing anchor, and operating the wrecking pump in the engine room and the steam pump aft; she also had two hand pumps amidships. About noon of the preceding day, January 31st, she had struck on Orleans Beach, near the southern end of Cape Cod. Upon hoisting the flying jib and lowering the mizzen and spanker sails, she immediately came off. She was kept

¶ 1. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

before the wind, and her pumps were started. According to the answer: "As soon as the vessel was fairly off, the mizzen and spanker were again set and the schooner stood up the beach. Upon attempting to go around Cape Cod, the wind being very heavy and the sea very rough, she was brought about and anchored at 5:30 p. m." Soon after anchoring water was found in the vessel's hold. The after steam pump was started, but did not lower the water, the indicator showing that the water was increasing. Thereupon the two hand pumps were started, and still the indicator showed that the water was rising in the vessel's hold. The forward wrecking pump was also started, and with all these pumps in operation it was found that they could not reduce the water in the hold, over five feet of water being shown by the indicator. In the early part of the evening Capt. Blake showed some agitation over the condition of his vessel. He spoke to the crew about the importance of working the hand pumps to the utmost. Whereupon the crew soon became alarmed at the condition of affairs, and wanted to leave the schooner. They obtained permission of the master to set two red lights in the rigging as signals of distress; and at about 10 minutes past 8 o'clock the Grecian, a steamer of the Boston & Philadelphia Steamship Line, 3,800 tons, Capt. William E. Briggs, master, bound from Boston to Philadelphia, saw the red lights of the Law, heard the distress whistles which the Law was sounding, and came within 700 feet of the schooner. Capt. Blake, of the Law, asked to be taken in tow, but the captain of the Grecian declined, and asked if the crew of the schooner desired to be taken off, to which Capt. Blake replied that they did. The testimony does not show that the captain of the steamship then disclosed where she was going or where he could land the crew of the schooner, although the captain of the Law undoubtedly had the intention to land, if possible, at Vineyard Haven and there procure a tug, if he could, to go to the relief of the schooner, if he should find her above water. After the loss of two boats, the crew of the schooner were landed upon the steamer, the seamen having their personal effects. The steamer then proceeded on her course, and, notwithstanding Capt. Blake requested to be landed at Vineyard Haven, no landing was made there. The steamship took the crew with her to Philadelphia.

The schooner Lyman M. Law laid at anchor through Saturday night, namely, the night of January 31st, without any crew aboard. She was seen late in the afternoon and in the evening of January 31st by the Palmet River Life-Saving Station crew, some four miles distant, on the shores of Cape Cod. Early Sunday morning Capt. Cole, the keeper of the station, observed the schooner still lying off his station. He immediately launched his surf boat, with six men, and proceeded towards the schooner, and arrived alongside of her about 8 o'clock in the morning. The entire life-saving crew immediately went on board the schooner, and found her abandoned, her boats gone, her davit falls hanging in the water, and her whole appearance showing that there had been a hasty departure of her crew. The life-savers at once concluded that the crew of the schooner had been taken off by some of the steamers whose search lights they had seen thrown upon the schooner the previous evening. The testimony shows that the

122 F.—52

life-saving crew found the schooner deep in the water. Forward of her poop the water was level with her decks, and between-decks the water could be seen running in near her stem. They found her hand pumps choked, and concluded that she could not be sailed in, and that she required the services of a steam vessel in order to save her. While they were aboard they observed the Standard Oil steam tug, with two barges in tow, coming down from the north, and they set the schooner's flag in the fore rigging in order to attract attention; but the tug kept upon her course, paying no heed. Capt. Cole and his life-saving crew then left the schooner, and returned to their station, and telephoned Provincetown for a steam tug, but did not find one. As they approached the shore they observed the steamer North ·Star coming from the southward. They also saw the Life-Saving Station boat from Cahoon Hollow Life-Saving Station, the next station above, putting off from the shore. Capt. Cole considered that sufficient means of safety were now being provided for the schooner, and therefore went ashore, and gave the matter no further consideration.

The steamship North Star, on her voyage from New York to Portland, first sighted the schooner Lyman M. Law about 9 o'clock Sunday morning, February 1st, and reached her about 10 o'clock. The North Star is a steamship owned and run by the Maine Steamship Company. She is a steel vessel, constructed in 1901, of 3,159 gross tons and 1,999 net tons. She is 300 feet long, 46 feet beam, and 17 feet draught when loaded, and carried at this time a crew of 49 men, all told. Her value is testified to be $375,000. She then had on board a general cargo of the value of $82,000. Her freight on the trip was. of the value of $2,667, as the testimony shows—making her total value, with cargo and freight, $459,667. She sailed Saturday, the 31st day of January, 1903, at 5:30 p. m., from her pier in New York on her regular passage to Portland, with her usual passenger list and full cargo. As she approached the Lyman M. Law about 10 o'clock Sunday morning no one could be seen on board. The schooner appeared low in the water, and with no signs of life. The master of the steamship, Capt. Bragg, gave several blasts of the whistle to see if anybody was on board. Nobody appeared, the steamship stopped, and a boat was put in readiness to lower. At this time the Cahoon Hollow Life-Saving Station crew were observed coming off from the shore. Capt. Bragg waited until the station boat got near the schooner, and then asked those in the boat to go on board and ascertain the situation of the schooner and what assistance she needed. About this time the schooner Hope Sherwood was observed a little distance to the southwestward of the Lyman M. Law, and it was seen that in attempting to lower a boat from the stern davits of the Sherwood the boat had capsized and three of her men were in the water. The life-saving crew at once proceeded to rescue these men, and after rescuing them the crew returned to the Lyman M. Law with the rescued men in their boat. In the meantime the North Star continued to lie near the Law, waiting for the station-crew to get back to her. When the life-saving station crew reached the Law they went on board. The three men belonging to the Hope Sherwood who had been taken from the capsized boat also went on board. They were followed by two other men from the

Hope Sherwood, who came to the Law in another boat. Capt. Bowley, of the life-saving station, looked the Law over carefully, and told Capt. Bragg that she appeared to be abandoned and was "in a sinking condition." Capt. Bragg then called his chief engineer, Samuel A. Sault, and requested him to go aboard the schooner with the second officer, and ascertain her condition, for the purpose of determining whether she could be towed into Provincetown.

In order to keep the services of the North Star and the Hope Sherwood distinct, we will now follow the action of the North Star and her crew. After going aboard the schooner, the men from the North Star made a thorough examination of her condition, and found the water was coming in through the scuppers upon the deck forward of the poop; that her forward pump had been taken apart, and left so, and that there was no water in her boiler; that her hand pumps were choked, and the windlass was so situated that the chain would not run out. They thought it necessary to cut the schooner's chains. They had taken their hack saws with them, and under the direction of Mr. Sault, the chief engineer, some of them were set at work sawing the chains, while Mr. Sault was carried back to the steamer to report the schooner's condition. Capt. Bragg immediately gave orders to get rid of the chains as quickly as possible, as all agreed it was necessary to lighten the schooner forward, and as he was anxious to get into Provincetown with the schooner as speedily as he should be able to do so. Mr. Sault immediately returned to the schooner with the necessary tools, and with the assistant engineer, Joseph A. N. Wells, he gave directions to the North Star crew to connect up the schooner's pumps and fill the boiler. They continued at that labor until 2 o'clock in the afternoon, at which time the chains were cut. There being no hawsers aboard the Law, the steamer's two hawsers were run to the schooner by the life-saving station crew. Mr. Sault and the assistant engineer, Mr. Wells, returned to the steamer, leaving four of the crew of the North Star on board the schooner, namely, Colbeth, Semple, O'Keefe, and Anderson. The life-saving station crew and two of the men from the Sherwood were still on board the schooner. During the time the North Star men were at work upon the Law no steam vessel appeared until just as the steamer was starting ahead, when a large steamship called the Kershaw, and of about the same tonnage as the North Star, came alongside, and inquired as to the trouble with the schooner, but made no offer to take her in tow. About two o'clock the North Star started to tow the schooner to Provincetown. The weather looked threatening. From the time the crew of the steamship and of the Hope Sherwood went aboard the Law, up to the time of the start for Provincetown, the schooner had settled in the water so that there were eight inches of water over her deck forward of the poop when she started. The life-saving station crew were still on board at the time of the start. As soon as the schooner was taken in tow, the forward pump was started, and continued to run throughout the night. Owing to her waterlogged condition, the schooner steered badly while in tow, and required two men constantly at her wheel. After going ahead a short distance she was found to be settling at the bow, and it became neces-

sary to stop her in order to stop up the hawse pipes. Capt. Bragg
and the chief engineer remained on the upper deck, at the stern of the
steamship, watching the schooner from the start until reaching Prov-
incetown, and gave instructions to the engine room as to the speed
of towing. It often became necessary to slow down and to stop.
Once the schooner took a sheer, and parted one of her tow-lines.
The captain of the steamer was under apprehension, both before and
after the towing began, that the schooner might go down at any mo-
ment. The life-saving station crew, during the time they were aboard,
kept their life belts on, and they testify that they, too, feared that the
schooner might go down at any time. At the start the captain of
the station, Capt. Bowley, requested the steamer to go ahead slowly,
so that in the event the schooner should go down by the head they
might have as much time as possible to leave her. He also instructed
his men to jump away from the schooner if she started to go down,
so as to be out of the suction. While the schooner was in tow the
captain of the life-saving crew requested the steamer to stop so that
their boat might be bailed out, and be in readiness if the schooner
should go down. At the time the schooner reached Provincetown
the water was from 18 inches to 2 feet over her deck forward of the
poop, and there was some fear, especially in the mind of the steam-
ship's first officer, that the schooner would sink while waiting in
Provincetown.

On arrival at Provincetown Capt. Bragg and the engineer called
up the company's agents in New York and Portland to determine
what action should be taken. Mr. Bartlett, the general agent of the
libelant company at Portland, inquired of various shipping men the
name of the consignees and the destination of the vessel, and, being
unable to obtain the required information, he thought it best to
have her taken into shoal water, so that if she should sink during
the night she could be readily raised. She had no ground tackle,
and it was doubtful whether her own pumps would keep her free, so
that this seemed the proper course to pursue. Thereupon Capt.
Bragg arranged with the tug Juno, of the Boston Towboat Company,
to take the schooner in nearer the shore, and placed his second of-
ficer, Colbeth, and two men who had run the engine, in charge of
the schooner. At 10:46 that evening, February 1st, the steamship
sailed for Portland without any second pilot, Capt. Bragg and his
first pilot performing extra duty. Monday morning, February 2d,
arrangements were made by the Maine Steamship Company with the
Boston Towboat Company to send a diver, steam pumps, chains, and
anchors to the Lyman M. Law. On the same day Capt. Humphrey
was sent by the libelant company to look after the schooner, and
relieve the men from the North Star, so that they could return to the
steamer. February 3d the Boston Towboat Company was notified
to make such further arrangements for the care of the schooner as
the towboat company and the owners thought advisable. Capt. Blake,
of the Law, reached Provincetown Harbor on the afternoon of Feb-
ruary 3d, and took command of the schooner. It does not appear
that he made any objection to what had been done in regard to slip-
ping the chains or placing on board the anchors and the steam

pump or taking the diver. On the 7th day of February the schooner proceeded in tow of the tug Storm King, of the Boston Towboat Company, for Portland, to which place she had been consigned, and where she arrived about 4 o'clock on the afternoon of the 9th of February. The cargo of coal she had on board was delivered to the consignee. The boiler, anchor, chain, and pump placed on board by the orders of Mr. Bartlett were returned, and Capt. Blake paid the Boston Towboat Company $650 for their use after he took possession of the Law.

During the time the steamer North Star was rendering the services which we have above described, the Hope Sherwood, with her officers and crew, was also rendering service. The Hope Sherwood is a four-masted schooner of 522 tons burden, carrying at the time of rendering the salvage service a crew of eight men, all told, and then had on board a cargo of 1,080 tons of coal, of the value, including freight, of about $12,000. At about daylight Sunday morning, February 1st, her watch observed the Lyman M. Law at anchor, apparently abandoned. At that time no other vessel was in sight. She at once altered her course, and passed under the stern of the Law, which appeared to be in a water-logged condition, but she passed on without boarding her, because the Palmet River Life-Saving crew were then seen to be on board. She had not proceeded very far up the beach, when about 9 o'clock her watch observed that the Life-Saving Station crew had placed a flag in the Law's rigging and left her. The Sherwood then wore about, and headed for the distressed vessel. She lowered a boat when under the Law's stern, containing three of her crew. This boat capsized, and the men were picked up by the Cahoon Hollow Life-Saving crew, as we have described. The life-saving crew placed the Sherwood's men on board the Law, and these men, with others who followed in a small boat, five in all, were on board of her before the men from the North Star. Two of them remained on board the Law during the time of the salvage service. They testify that they thought there was a reasonable prospect that they could have started the pumps, controlled the water coming on board, got the vessel under way, and sailed her into Provincetown. The Sherwood, with her other men, was standing by to render such assistance as she was able to render. The men of the Hope Sherwood, however, assented at once to the arrangement which insured quicker relief to the Law; that the North Star should tow her to Provincetown, the Sherwood's crew co-operating in that work, so far as they were able, a part of them by actual work upon the Law, others by standing by with the Sherwood ready to assist. Capt. Gilbert, of the Sherwood, appears to be a prompt, efficient young officer. He did what he could by standing by with his schooner to render assistance. The work of getting the schooner ready to be towed to Provincetown was shared between the crew of the North Star, the crew of the Sherwood, and the life-saving station crew. As the crew of the North Star had their hack saws and other implements, they rendered perhaps the most efficient service, but all did faithful work, so far as they were able. When towage to Provincetown began, Stanton and Johansen remained upon the Law. The Sherwood, with

Capt. Gilbert and five men, continued on her voyage to Boston. From the time the men of the Hope Sherwood and the North Star came aboard the Law until the landing at Provincetown, the men from the North Star, from the Sherwood, and from the life-saving station were aboard the Law, and each set of men now assume that they were in command of the schooner. But it is not material to inquire who was actually in command, or who arranged for the towing of the schooner into Provincetown, as the court has to decide only what actual salvage service was rendered.

It is now the duty of the court to apply the principles of the law of salvage to the facts of the case which have been briefly recited, and to decide what should be awarded to the salvors for their successful service.

In the case of The Sandringham (D. C.) 10 Fed. 556, Judge Hughes, in a masterly and exhaustive opinion, reviews the principles upon which cases of this character should be decided. He very aptly observes that, although the amount lies within the discretion of the court, yet a judge is not at liberty to render an arbitrary judgment at his own individual discretion or caprice, but must be governed by the teachings of precedents and principles of the law of salvage. He uses the familiar definition of salvage, namely: "Salvage is a reward or bounty, exceeding the actual value of their services, given to those by means of whose labor, intrepidity, and perseverance a ship or her goods has been saved from shipwreck or other dangers of the sea."

Chief Justice Marshall, very early in our judicial history, stated the policy of the law in regard to salvage in The Blaireau, 2 Cranch, 266, 2 L. Ed. 266: .

"If the property of an individual on land be exposed to the greatest peril, and be saved by the voluntary exertions of any person whatever; if valuable goods be rescued from a house in flames, at the imminent hazard of life, by the salvor—no remuneration in the shape of salvage is allowed. The act is highly meritorious, and the service is as great as if rendered at sea, yet the claim for salvage could not, perhaps, be supported. It is certainly not made. Let precisely the same service, at precisely the same hazard, be rendered at sea, and a very ample reward will be bestowed in the courts of justice. If we search for the motives producing this apparent prodigality in rewarding services rendered at sea, we shall find them in a liberal and enlarged policy. The allowance of a very ample compensation for these services, one very much exceeding the mere risk encountered and labor employed in effecting them, is intended as an inducement to render them, which it is for the public interests, and for the general interests of humanity, to hold forth to those who navigate the ocean."

Judge Story adopts the same line of definition in The Henry Ewbank, 1 Sumn. 400, Fed. Cas. No. 6,376:

"The law does not stop short with a mere allowance to the owner of an adequate indemnity for the risk so taken. It has a more enlarged policy and a higher aim. It looks to the common safety and interest of the whole commercial world in cases of this nature, and it bestows upon the owner a liberal bounty to stimulate him to a just zeal in the common cause, and not to clog his voyages with narrow instructions which should interdict his master from salvage service. * * * The law offers not a premium of indemnity only, but an ample reward, measured by an enlightened liberality and forecast."

Judge Hughes in The Sandringham, supra, in referring to the leading considerations to be observed in determining the amount of the

award for salvage services, says that he does not know where those considerations can be more explicitly stated than in the instructions given in 1865 by the British Board of Trade to the receivers of wrecks of Great Britain. Embodying the result of the decisions of the English and American courts of admiralty, the board of trade laid down the rules to be considered in determining the amount of the award.

(1) The degree of danger from which the lives or property are rescued.

(2) The value of the property saved.

(3) The risk incurred by the salvors.

(4) The value of the property employed by the salvors in the wrecking enterprise, and the danger to which it was exposed.

(5) The skill shown in rendering the service.

(6) The time and labor occupied.

And Judge Hughes adds a seventh consideration:

(7) The degree of success achieved, and the proportions of value lost and saved.

We will now comment upon these principles as applied to the salvage service rendered by the North Star.

First. The degree of danger from which the property in the case at bar was rescued: The Lyman M. Law was a large, deeply laden coal schooner, anchored off the shore of Cape Cod, in the winter, in a sinking condition, abandoned by her crew, her pumps unable to reduce the water in her hold. The steamer Grecian had refused to render any salvage service, and other vessels passing by had given the schooner no heed. From the evidence the court must believe that the services of a steamer were necessary to relieve the schooner from her perilous situation. We believe that the Lyman M. Law and her cargo must have been a total loss but for the relief offered by the North Star. The master and the crew had left the ship for their safety. The master, to be sure, when he left her, had a general intention of coming back with a tow to relieve the schooner if she should be afloat when he returned. But it has been held that, if the master and crew leave their ship for the safety of their lives, a mere intention of sending a steamer back for relief does not take away from a vessel the character of a legal derelict. The Coromandel, Swabey, 205. It is not necessary, however, to discuss the technical question whether or not the schooner was a derelict, or to consider all the old learning upon the subject of derelicts. The question to be decided is in what peril the vessel was found, and what reward should be given for the services rendered by the salvors. It cannot be doubted that the crew abandoned the schooner in great haste, in fear of their lives, the seamen taking with them their personal effects. As bearing upon the question of the danger in which she was lying, the testimony of the captain and members of the station crew is very important. Capt. Bowley testifies that the schooner was "in a sinking condition." He and his crew wore their life belts during the whole time they were on board. They regarded the vessel to be 'in some danger of sinking at all times during the salvage service.

Second. The value of the property saved: The testimony shows that the value of the schooner herself was $23,500, and the value of

her cargo, in which is included the freight, was not less than $12,500, making the total value of the property saved not less than $36,000.

Third. The risk incurred by the salvors: As to the risk of the individual salvors who were on board the schooner, we have already commented upon the fact that the vessel was in a sinking condition, lying very low in the water, that the life-saving crew had instructions to keep on their life belts, and that there was some danger at all times of sinking. This danger was not very great, as the life-saving crew were present with their boat; but it is an element that should have some weight with us in estimating the salvage service. The North Star assumed a very great risk in taking the schooner in tow on this dangerous coast and towing her to Provincetown. Judge Hughes, in The Great Northern (D. C.) 72 Fed. 678, says:

"Towing a disabled vessel on the high sea is always a salvage service, owing to the latent dangers from multiform accidents to which ships are constantly liable. * * * After getting under way and commencing the towing service, there is constant danger on the open sea when the disabled ship has no power of self-control. * * * It is the latent danger from the multiform accidents to which ships are constantly liable which makes a towage service on the open sea rendered to a disabled ship always a salvage service."

The North Star was not fitted for towing vessels. She was in constant danger of the propeller getting afoul of the towing hawser. If such fouling had taken place, she might well have herself become disabled. Capt. Bragg was apprehensive of this danger. The schooner, on reaching Provincetown Harbor, owing to her unmanageable condition, struck the North Star, crushing her boat, injuring her rail, and breaking her ash ejector. Capt. Bragg testifies that the steamship at the time of this collision could not be moved, as the hawser was liable to foul the propeller. It has been well urged that if this difficulty had occurred at sea, and the steamer had become unmanageable, there was great danger to herself—a danger for which the owners of the steamship would have no redress. The risk is one which the Grecian would not undertake, and which the other passing vessels avoided. Judge Benedict in The Gallego (D. C.) 30 Fed. 271, is governed by these considerations. He comments on the fact that four steamers in succession passed in sight of the Gallego and did not stop.

Fourth. The value of the property employed by the salvors in the wrecking enterprise, and the danger to which it was exposed: The value of the North Star, her cargo and freight, is testified to be $459,667. She was a large steamer on the line between Portland and New York. The danger to which this vessel was exposed we have already commented upon under the third consideration.

Fifth. The skill shown in rendering the service: The testimony shows that a fair and competent amount of skill, at least, was exhibited by the captain of the North Star and her crew in the important service which they rendered.

Under items fifth and sixth, in discussing the skill shown in rendering the service, and the time and labor occupied, we must consider the faithfulness of the captain and crew of the North Star in standing by the disabled schooner from the moment they saw her until they

left her safe in the harbor at Provincetown. We must consider the fact that she left her regular course, and took all her chances in doing this service. In the case of The Anna, Fed. Cas. No. 398, Judge Benedict comments upon the duty of adequately appreciating the service of a regular liner departing from its ordinary duties and performing a salvage service.

Seventh. The degree of success achieved, and the proportions of value lost and saved: The success of the salvage service was perfect. The Lyman M. Law, with her whole cargo, was brought to a place of safety. The cases all agree that the element of saving the whole of a vessel and her cargo is a very important consideration in estimating salvage service. In the case of the Isaac Allerton, referred to in Marvin on Wrecks & Salvage, p. 122, the court says that "a proportion of the property lost must enter into consideration. In a case in which, out of property worth $200,000, in danger, only the value of $50,000 was rescued, I would give a smaller percentage for salvage than I would in another case where, other circumstances being equal, property worth $50,000 was in danger and was all saved."

In the consideration of the services of the Hope Sherwood, the same reasoning applies with reference to the first two items as in the case of the North Star. In reference to the third salvage ingredient, namely, the risk incurred by the salvors, it is enough to say in regard to those upon the deck of the disabled schooner, and of those conducting her to Provincetown, that the same considerations inhere as in the case of the North Star.

In reference to the fourth item of salvage service, namely, the value of the Hope Sherwood, we find the value of the Hope Sherwood to be $40,000, and that of her freight and cargo to be $12,000. She was not a steam vessel, and was not in position to render so effective service as that rendered by the North Star, but she did render efficient service, and while other vessels passed by, not heeding the danger of the distressed vessel, Capt. Gilbert showed himself to be a young man of great courage, energy, and promptness. We do not depreciate the value of his services in standing off upon that dangerous coast, while he and his vessel could be made effective in relieving a disabled schooner. He assumed a very decided risk in allowing his vessel, in the winter time, to leave her voyage and remain in that dangerous situation.

In regard to the fifth, sixth, and seventh salvage ingredients as applied to the Hope Sherwood, we may fairly say that while the time and labor occupied in the salvage service was not so much in the Hope Sherwood as in the North Star, it was all the time and labor that was required of the Hope Sherwood and her crew, they using all the skill that was necessary. While they believed that, if no steam vessel had appeared, they could have performed the whole salvage service, they at once yielded to a service which offered more hopes of success. The courage of Capt. Gilbert and his crew shown in daring to enter upon a doubtful service, and doing their best with the means in their power, should be encouraged. What Capt. Gilbert did was bravely undertaken, and perseveringly and faithfully pursued.

We come now to consider the bearing of the rules we have cited and of the general law of salvage upon this case. It is impossible to cite, or even to examine in detail, the many decisions bearing upon questions of amount. Every judge has had his own way of passing upon such questions. Judge Hughes says in The Sandringham, supra: "A peculiarity of admiralty cases, more marked than in those illustrating any other branch of the law, is that there are seldom any two cases that are alike in more than one or two of their features." Salvage is not a question of estimating the value of services, it is not a matter of quantum meruit, it is not a matter of fixing even a fair compensation pro opere et labore; it is a question of deciding how much reward or bounty should be given for encouragement of vessels, not only of doing justice to the particular case in hand, but for the encouragement of other vessels to volunteer their aid to distressed mariners.

The case at bar has pretty much all the salvage ingredients contained in the books. It is not the case of a service of a steamer whose regular pursuit is to tow and relieve vessels. It is the case of vessels engaged in entirely outside pursuits coming to the rescue of endangered property.

In the case of The Swiftsure (D. C.) 4 Fed. 463, the court says:

"The allowance in such cases is intended to be sufficiently liberal to make every one concerned eager to perform the service with promptness and energy, and also to encourage the maintenance of steam vessels sufficiently powerful to make the assistance effective. It would be contrary to the spirit of the maritime law to reduce the salvage compensation below the standard of liberal inducement, and it would equally frustrate its purpose if the allowance should be so large and so out of proportion to the services actually rendered as to cause vessels in critical situations to hesitate or decline to receive assistance because of its ruinous cost."

In the case of The Gallego, supra, Judge Benedict says:

"The rule of the maritime law in respect to salvage is not so much compensation for work and labor performed as to hold out to those who sail the seas a strong inducement to volunteer their aid to vessels in distress. The importance attached to this consideration by the English admiralty is shown by the remark of the court in deciding the case of The Rio Lenia, 24 Mitch. Mar. Reg. 628. * * * In that case Sir Robert Phillimore says: 'It has been impressed on the mind of the court that there seems to be a growing dislike on the part of owners of ships to allow their vessels to render assistance, even when no jeopardy of life is concerned. That must be met by a liberal allowance on the part of the court, whose duty it is to consider all the circumstances of the case.' * * * This remark deserves emphasis from the fact proved in this case, that four steamers in succession passed within sight of the Gallego's signals and did not stop."

Judge Benedict, in the case of The Anna, supra, says:

"One reason for a liberal award is stated to be that, the property all having been abandoned as lost, it does not lie in the mouth of its owner to complain of the reward paid to strangers who return his property to him, and this consideration has been adverted to as having equal force whether the vessel abandoned is in a sound or in a wrecked condition. * * * For the taking in charge and saving of a wreck so situated, the reward should be such as to insure at all times the rendering of any amount of labor, the incurring of any risk, and the deviation of any vessel from any voyage in order to supply the wreck with a crew and make her presence safe. If in this case one of the ocean-bound steamers had fallen in with The Anna, and turned about to tow her to a place of safety, I should not have hesitated to award

liberal compensation for the detention, expense, and importance of such service, without much reference to the amount of the property absorbed thereby."

In the case at bar, as in the case of The Gallego, steamers had passed the distressed and abandoned schooner, and had either refused to render any salvage service or had paid no heed. The thing did happen which the court adverts to in the case of The Anna—a regular liner did deviate from her course, did assume all the detention and all the risks necessary to do an act which should have the encouragement of the courts. A sailing vessel, also engaged in commerce, turns from her voyage and renders good service.

In fixing an award which will induce a great steamer, upon a regular passenger line, and with a passenger list, to depart from her voyage, and undertake to rescue a disabled vessel, there must, in the judgment of the court, be a limit to which the doctrine of The Anna, which we have above referred to, should be allowed to go. On this subject Judge Benedict, in the Agnes Manning (D. C.) 59 Fed. 481, comments on the duty of encouraging steamers to incur the hazard of towing vessels which lie in the pathways of commerce, so that commerce will not be endangered by floating wrecks. The presence of wrecks in the regular track of vessels, without lights, in the night-time, especially in thick weather, with no one to give warning of their location, may justly cause alarm, for they are liable to occasion great loss of life and of property. But the court is not justified in carrying this consideration to the extent of encouraging a passenger steamer, even under the stress of so weighty considerations as this, to expose her own passengers to danger in attempting a salvage service. We do not think that the North Star, in doing salvage service in the case at bar, did imperil her own passenger list, but we think she went to the full extent of taking such risks as she needed to take in order to render such services as were necessary in order to do meritorious service.

In coming to the conclusion as to the amounts, the court has tried to follow the principles cited in this opinion, and has studied in that regard all the decisions of that great and learned pioneer in admiralty law, Judge Ware, of our own district, while trying to fix such an award as shall be suitable for public policy and the proper encouragement to vessels in commerce and to ocean liners to turn from their paths and assist the distressed. Our endeavor has been not to make an exorbitant estimate of awards, having in view that the Supreme Court has said that appellate courts are reluctant to disturb an award unless clearly satisfied that the court has made an exorbitant estimate.

In fixing the amount of salvage, we exclude, of course, the crew of the life-saving station from any award. While they rendered most valuable and effective service, they were in duty bound to do this in the performance of their duty as life-savers and under the statutes of the United States. In view of the services rendered by the steamship North Star and the schooner Hope Sherwood, and their respective crews, keeping also in mind the damages sustained by the steamer North Star in rendering the salvage service, and the ex-

penses incurred by the steamship company in caring for and preserving the property for the owners, disallowing, however, the item of $300 paid by that company for insurance, I award as full salvage compensation to said vessels and their crews the sum of $12,000. From this sum there shall be paid to the Maine Steamship Company, as the owner of the steamship North Star, and to the crew of the said ship at the time of rendering the salvage service, in full for all damages and expenses incurred in performing the salvage service, and in the preservation and care of the property, and as a bounty for the service rendered by said steamship and her crew, the sum of $9,500. From that sum there shall be paid to the crew of said ship the sum of $2,125. The aforesaid amount shall be net to the officers and crew of said ship, without any deductions for costs or counsel fees. The balance of said amount, or the sum of $7,375, shall be paid the Maine Steamship Company, as the owner of the North Star. The balance of said salvage award, or the sum of $2,500, shall be paid to the owners and crew of the schooner Hope Sherwood, $600 of the same to be apportioned among the officers and crew. The aforesaid amount shall be net to the officers and crew of said schooner, without any deductions for costs or counsel fees; the balance of said sum, or $1,900, shall be paid to C. A. Davis, as the owner of the schooner Hope Sherwood. The above awards shall be in full for all expenses, services, and bounties.

Let a decree be entered in accordance with this opinion, with costs.