## THE LOTTIE E. HOPKINS.

(District Court, D. Maine. November 26, 1904.)

No. 158.

1. SALVAGE—PRINCIPLES AND BASIS OF AWARD.

   A salvage award is not to be based on the mere arbitrary judgment of the court, but must be governed by the principles of the law of salvage, which require the amount allowed to be sufficiently generous to encourage others to render like service under like conditions; and the court, in applying these principles, cannot follow any unvarying rule as to proportion with reference to values.

2. SAME—SALVAGE SERVICE—TOWING DISABLED VESSEL AT SEA.

   The taking in tow of a disabled vessel on the open sea by a tug is always a salvage service.

3. SAME—AMOUNT OF AWARD.

   A fishing schooner of 47 tons, net, valued at from $600 to $1,000, and having fish on board to the value of $60, having lost one anchor and her rudder, and being blown toward the shore, anchored at night near a ledge on the south shore of an island off the Maine coast; sending word by a passing schooner for a tug. The next morning the tug Carita, valued at $5,000, went to her assistance from a port 10 miles northwest. The wind was blowing heavily from the southwest, and the sea was very rough. One of the tug's coal bunkers was washed away, and it was necessary to board over the bunkers to keep her from filling. After a difficult trip the schooner was reached and taken in tow, and, by careful management, was brought safely to port. The weather indications were stormy, and the schooner was in considerable peril, being held by a single anchor on a rocky bottom. *Held*, that the towage was a salvage service, for which the tug and her crew were entitled to an award of $200.

In Admiralty. Suit to recover for salvage services.

Benjamin Thompson, for libelants.

Clarence E. Sawyer, for claimants.

HALE, District Judge. This case comes before the court upon a libel in rem for salvage brought by Cyrus R. Tupper in behalf of himself and the other owners and the crew of the steam tug Carita. The schooner Lottie E. Hopkins is a fishing vessel of about 47 tons, net tonnage, and at the time in question was owned by William A. Trufant, of Harpswell. Her value is estimated to be from $600 to $1,000. At the time the salvage service was rendered, she had on board fish of the value of $60. On September 23, 1904, she was engaged in the business of fishing, and was under the command of Capt. Gilbert Doughty. On that day, while prosecuting her business of fishing, she was at anchor on the Great Ledge, about 20 miles off shore, and about 10 miles outside of Damariscove Island. About 8 o'clock in the evening, during a heavy breeze, it was discovered that her hawser had chafed off about 10 fathoms from the bottom, losing one of her anchors. The crew immediately made sail, intending to go to the southward of Seguin, in order to reach Harpswell; but, upon attempting to luff their vessel, it was

¶ 2. See Salvage, vol. 43, Cent. Dig. §§ 23–25.

¶ 3. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

found that there was some trouble with the rudder, and, upon taking off the wheel box, it was found that the rudder was gone. The schooner was blown in toward the land until about 10 o'clock that night, when she had reached a point near Bantam Ledge, off the southerly end of Damariscove. She then jibed, and, as she was liable to go onto the ledge, the other anchor was let go. At the time of anchoring it was blowing harder than it had previously blown during the day, and was still breezing on. A little later a schooner was observed going in toward the land. Capt. Doughty hailed the schooner, and asked to have a steam tug sent out. At the time of anchoring, the Lottie E. Hopkins was lying about northwest from Bantam Rock, and about a quarter of a mile distant from it, in about 35 fathoms of water. The place of anchorage was a rocky bottom. Capt. Doughty, of the schooner, testifies that he was intending to rig up a temporary steering gear the next morning, with the use of the hawser.

The steam tug Carita is a vessel of the value of about $5,000, as the testimony tends to show, and is the largest steam tug engaged in towing in Boothbay Harbor and vicinity. Bath is about 15 miles distant from Boothbay Harbor, and is the nearest point at which larger steam tugs could have been obtained.

Between 5 and 6 o'clock on the morning of Saturday, the 24th day of September, 1904, the master and crew of the steam tug were informed that a schooner was lying off the Bantam Rock, in the vicinity of Damariscove, with loss of rudder and anchor, and in need of a steam tug. Upon receiving this information, the tug immediately started to go to Damariscove, which is about 10 miles southeast of Boothbay Harbor, and directly to seaward. At the time of her departure from Boothbay the wind was about south-southwest, blowing heavily, with a strong sea running. The testimony tends to show that the master of the tug, on account of the heavy sea, had grave apprehensions as to the advisability of continuing in that direction. Soon after leaving Boothbay Harbor one of the coal bunkers was washed away, and it was found necessary to nail boards over her bunkers in order to prevent her from filling. It was also necessary to slow her engine down, and keep her head to the sea as much as possible. The steam tug found the schooner at anchor off the Bantam Rock, in a strong wind and heavy sea. The crew of the steam tug testify that the sea was increasing, while the crew of the schooner testify that it had moderated since the previous night. All, however, agree that the weather looked bad, and that at about 1 o'clock that day the storm began to increase, that it blew very hard, and that there was a rough sea. The schooner had made no preparations to get under way, although her crew testify that they intended to rig up a temporary rudder and try to sail her in if assistance had not been obtained. All agree that there was no vessel in the vicinity of the schooner on that day, and that assistance could not have been obtained except by sending to Bath; there being no other steamer at Boothbay Harbor suitable to go to the relief of the schooner. The witnesses do not agree as to the effect of an attempt to get the

schooner under way at the time without assistance, or as to the result if she had chafed off her hawser or dragged during the night of the 23d. The witnesses in behalf of the schooner say that, if they could have managed her, they would have made to the northward of Damariscove, while the witnesses in behalf of the tug testify that, if the schooner had dragged or parted, she would have gone onto the Bantam or the Motions, off Damariscove. There is also testimony that at that time it was breaking heavily on the Bantam and on the Motions, and that the weather indications looked stormy and heavy; that those in control of the tug could not bring her very close to the schooner at the time, on account of having to keep her head to the sea, as they did not like to have her lose her headway and fall off. Capt. Doughty, of the schooner, with two men in his crew, came on board the steamer in a dory, but no agreement was made respecting salvage. A hawser was run from the tug to the schooner, and as soon as it was made fast the steamer held the schooner up until the anchor was up, when she steamed ahead slowly. By allowing the hawser to drag in the water, and by sheering in the opposite direction when the schooner sheered, the tug towed the schooner into Boothbay Harbor; reaching there between 9 and 10 o'clock in the forenoon of the same day.

What amount should be allowed to the libelants for their salvage service? In the case of The Lyman M. Law (D. C.) 122 Fed. 816, this court had before it a salvage case in which we fully discussed the law of salvage, and the principles which should be applied in making an award. We then quoted from The Sandringham (D. C.) 10 Fed. 556, in which Judge Hughes reviews the principles upon which cases of this kind should be decided. We quoted in that case the familiar definition of salvage, namely:

"Salvage is a reward or bounty, exceeding the full value of their services, given to those by means of whose labor, intrepidity, and perseverance a ship or her goods has been saved from shipwreck or other dangers of the sea."

· We quoted also the statement of the rules which courts are accustomed to follow in determining a salvage award.

In The Blackwell, 10 Wall. 1, 19 L. Ed. 870, Mr. Justice Clifford also announced the main ingredients in determining the amount of the reward for a salvage service, and gave those ingredients substantially the same as, although entirely independent from, the case of The Sandringham, supra. These rules have often been applied to the case of tugs rendering a salvage service. In this district, in Baker v. Hemenway, 2 Low. 501, Fed. Cas. No. 770, Judge Lowell said:

"As well as I can estimate the intent of the courts, it has been to give to tugs what will be a handsome gratuity—enough to induce prompt and even eager assistance; and this would be enhanced slightly by a great value at risk, though in no important or definite proportion to value."

As we have already said in The Lyman M. Law, a court is not at liberty to render a mere arbitrary judgment upon individual discretion, but must be governed by the principles of the law of salvage; but under this general rule there is often serious question as to what award should be made to meet the facts in any given

case, always having in mind that a court has not to decide merely with regard to the question of what services are worth, but to give a fairly generous award, such as to encourage salvors to render like services under like conditions. In making such award the court cannot follow any unvarying rule as to proportion in reference to values.

There can be no question but that the service rendered in this case was a salvage service. In the case of The Great Northern (D. C.) 72 Fed. 678, the court said:

"Towing a disabled vessel on the high seas is always a salvage service, owing to the latent dangers from the multiform accidents to which ships are constantly liable. * * * Courts, judges, and lawyers of the interior are apt to assimilate this service to towing on inland canals and rivers of the country, and are apt not to realize the full nature of towing at sea. * * * After getting under way and commencing the towing service, there is constant danger on the open sea when the disabled ship has no power of self-control. * * * It is the latent danger from the multiform accidents, to which ships are constantly liable that makes a towage service on the open seas, rendered to a disabled ship, always a salvage service."

This fishing schooner was lying near the Bantam Rock, in a dangerous locality. The wind was blowing hard, and the sea was rough. The testimony is somewhat contradictory; but the court must find that the schooner was in great hazard, that she was disabled, and that, if she had dragged, she would have been in great danger of going onto the rocks. While the learned counsel for the claimant insists that other assistance might have been obtained, it is undoubtedly true that no other assistance presented itself, and the only means of safety that was extended to the schooner came from the tug. It is undoubtedly true, also, that the steamer took some risk in doing the salvage service. She started promptly at the call of the disabled vessel. The sea, when the tug got outside, was rough. It was even thought by the captain at one time that it was too rough to keep on. She had to be kept head to the sea, and slowed about, her bunkers nailed down. There was some fear that the vessel would fill. When the tug arrived at the schooner, it is not probable that the damaged vessel could have remained long in her dangerous position.

When a tug, under circumstances like these, renders prompt and efficient salvage service, she should be rewarded liberally. The part of the Maine coast where the damaged schooner was lying is a perilous place in bad weather. Fishing vessels should be made to feel that the courts will hold out to salvors all proper inducements to give aid to vessels in distress in such places. Tugboats, in the regular conduct of their business, have sometimes been too apt to refuse salvage service in places of danger. They should be encouraged in the manner pointed out by Judge Lowell in Baker v. Hemenway, supra. The court is of the opinion that the sum of $200, which was suggested by the owner of the tug, was not too great a reward, under the circumstances of the case.

Let a decree be entered for the libelant for the sum of $200, which shall be in full for all interests represented by the libel, with costs.