THE REBECCA SHEPHERD.

(District Court, D. Maine. November 17, 1906.)

No. 203.

1. SALVAGE—NATURE OF SERVICE—TOWING INJURED SCHOONER INTO PORT.

The three-masted schooner Rebecca Shepherd, laden with stone, left the port of Rockland, Me., and when 20 miles out struck on a ledge, and, although she got off after pounding for 20 minutes, was so injured that she began to leak. She started back for Rockland with the crew pumping; but the wind and tide were against her, and the water in her hold was gaining, and she hoisted a signal for assistance. The tug Sea King, which was towing a vessel to sea, on seeing the signal left her tow and went to the assistance of the Shepherd and towed her safely into the harbor of Rockland, where she was beached. There was no other vessel which could have rendered the service, and there was a possibility at least that without it the Shepherd would have foundered before reaching port. The Shepherd and her cargo were sold under process and realized the sum of about $4,000 net. The value of the Sea King was about $30,000, and she carried a crew of eight men. *Held*, that the service was a salvage service and entitled to be compensated as such; that an award would be made of $450, of which $50 should be divided among the crew and the remainder paid to the owner.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 23, 24, 80–82, 94, 101.

Awards in federal courts, see The Lamington, 30 C. C. A. 280.]

2. SAME—DUTY TO RENDER SERVICE—ABANDONMENT OF TOW.

A court will not encourage a tug to abandon a contract of towage and expose her tow to great danger in order to go to the assistance of another vessel, but such action is commendable where the tow will not be subjected to any special peril of the sea or weather; the case being one in which the master is required to exercise good judgment under the circumstances.

In Admiralty. Suit for salvage.

B. Thompson, for libelant.
A. S. Littlefield, for interveners.
Geo. E. Bird, for claimant.

HALE, District Judge. The Knickerbocker Steam Towage Company brings this libel for salvage in its own behalf, and in behalf of the master and crew of the steam tug Sea King, against the schooner Rebecca Shepherd and her cargo of stone. The schooner and cargo have been sold under process issued by this court; the schooner for $3,500, and the cargo for $725. After paying expenses of the sale, the balance of the proceeds of the schooner, $3,394.55, and the balance of the proceeds of the cargo, $636.24, are now in the registry of the court.

The schooner Rebecca Shepherd is a three-masted vessel of the burden of 390 tons. In May, 1906, she loaded at Mt. Waldo, Me., a cargo of 3,500 paving blocks, estimated by the captain to be about 550 tons weight. She was drawing, when loaded, 14 feet aft and 13 feet 6 inches forward. She was towed out of her port of loading by a tug of the libelant corporation. She proceeded on her voyage and made a harbor at Rockland. On May 30th, at 5 o'clock in the morning, she set sail from Rockland and proceeded on her voyage, in good weather, with a fresh breeze. She made from five to seven knots, and about 8 o'clock in the morning she struck on Matinic Ledge, off the northerly end of Matinic Island, about 20 miles from Rockland. She struck, owing to the fact, as her captain says, that the buoy indicating the ledge was out of position. At the time of grounding there was an ebb tide. The schooner remained, pounding on the ledge, about 20 minutes, at the end of which time her crew worked her off. They then tried her pumps and found her leaking. They pumped until about 9 o'clock, when the pumps sucked. After a short time they again started the pumps and continued pumping until she reached Rockland. During all this time, the testimony tends to show that the water kept gaining on them. Her captain headed her for Rockland with the intention of beaching her; that being the nearest harbor where a vessel of her draft could be beached. He set her colors in the starboard mizzen rigging for assistance. The testimony tends to show that, in getting into Rockland harbor, she would have the wind ahead; that the water was gaining in spite of pumping; and that it would have "been almost impossible to beat in against wind and tide," had it not been for the assistance of the tug which made fast to her off Two Bush Island, between 9 and 10 o'clock in the morning.

The Sea King is an ocean tug of about 124 gross tons, about 95 feet in length, drawing about 12 feet. Her value is estimated at from

$28,000 to $30,000. At the time of rendering the services in question, she carried a crew of eight men, consisting of master, mate, engineer, two firemen, steward, and two deck hands, whose wages were $370 a month. She left Bangor on May 30, 1906, at 2 o'clock in the morning, with a four-masted schooner, the Edward E. Briery, in tow. The Briery was ice laden, with a draft of 22 feet, and was bound on a voyage to New York. She was under contract to be towed by the Sea King to sea. Between 9 and 10 o'clock in the morning, the master of the Sea King, Capt. Hathorne, saw the Shepherd with the flag in her starboard mizzen rigging off Two Bush Island. He knew that she was stone laden. He saw that she was close hauled; that the men were at her pumps; that there was a signal for assistance. He knew she was in trouble and trying to work back to a harbor. He said to his mate: "We'll let go of this schooner and go back and see what's the matter." He accordingly cast off the Briery's hawser, although he had about 10 miles further to tow her to sea before completing the contract of towage. He proceeded to the Shepherd under a speed bell, approached her on the windward side, and found the mate and four men pumping. The mate told him that they wanted to go to Rockland and be put on the mud. He then made fast to the schooner, at once started ahead, and towed her at half speed on a tow line of about 50 fathoms, not thinking it safe to tow her at full speed, because he said the swell "throws the vessel ahead and slacks the line down and throws the boat ahead and it comes up taut like a fiddle-string." He watched the tow line, and says he towed her as fast as he dared. The testimony tends to show that the crew of the schooner remained at her pumps from the time the tug made fast until she reached Rockland; that the mate also was working at the pumps for a part of the time; that later the crew took intervals of rest of about 1½ minutes; that, all the time, the water kept gaining; that there were no other vessels in the vicinity that could have been of any assistance; that no other tug was in sight during the morning, nor until after they reached Rockland; that the schooner could not have received help from the life saving station, or from any other source. The tug and her tow passed in by Rockland breakwater about noon; Capt. Hathorne signaled for the Shepherd to haul in her hawser, and wanted her captain to let his anchor go, and get a harbor tug to put his schooner where he wanted her. Capt. Hathorne said he was not familiar with the docks, and did not dare to risk his tug in trying to put the schooner in, fearing that she would break her wheel, as she was drawing 12 feet. But the captain of the schooner insisted that the tug should put her in, and said: "Cap., I do not want to lie here. I want you to shove me into shoaler water. I don't want you to leave me here." The testimony tends to show that the Shepherd had lost her headway; that the tug headed up into the harbor with the Shepherd, the mate of the tug sounding with a lead all the time; that the vessels proceeded slowly towards the mud, the tug's wheel stirring up the mud behind her, and pushing the schooner up onto the mud as far as she would go; that the anchor of the schooner was then let go; that the master of the tug went ashore, at the request of the captain of the schooner, to get a local steam tug, but, not

finding the towboat offices in Rockland open, he went to the wharf and found the master of the tug Somers N. Smith, who agreed to go off and do what he could; that the Sea King then left, and, later in the afternoon, the tug Somers N. Smith proceeded to the schooner and towed her to Tilson's Dock and made her fast; that the crew of the schooner continued to pump, two at a time, for ten minutes, with intervals of rest of from 3 to 5 minutes, until 6 o'clock that afternoon; that the captain of the schooner hired four men from the shore to pump until 6 o'clock the next morning; that later the crew and four extra men kept the pumps going up to 4 o'clock of the morning of the 31st, when the tug Somers N. Smith began to pump, and continued until June 5th; that the schooner did not leak worse after getting into Rockland than she did before; that the crew were exhausted with pumping; that the employment of the tug Somers N. Smith was necessary; and that she was paid $120 per day for pumping on June 3d and 4th.

I have found it necessary to give the above testimony in detail, as it becomes material in coming to a conclusion in regard to the character of the services rendered by the tug.

1. Was the service rendered by the steam tug Sea King a salvage service?

In Baker v. Hemenway, Fed. Cas. No. 770, Judge Lowell said:

"That a vessel in distress accepting services without a special contract, and the absence of a usage of the port, accepts a salvage assistance, is abundantly established. * * * The important and difficult part of the case is not the name by which it is to be called, but the amount which shall be decreed. * * * The service resembled towage. I do not mean that there is any generic difference between towage and salvage. In the absence of a contract, the towing of a vessel in peril or disabled is salvage; but, as a convenient word to distinguish an ordinary case of contract from one of salvage, 'towage' is often used."

Further on in the opinion, Judge Lowell cites a certain case, where Judge Blatchford, "refusing salvage, had allowed to the corporations what he called a liberal allowance for work and labor." He then speaks of the affirmance of Judge Blatchford's decision by the Circuit Court of Appeals, and says:

"That affirmance was wrong, unless Judge Blatchford had in fact, though not in name, given salvage. And such I suppose to be the case. He spoke of a liberal compensation. But liberality is salvage. There is no place for liberality in an action of contract. * * * The essential difference in assessing damages in contract and in salvage is that in the former nothing can be considered but the means employed; in salvage, even when the value saved is left out of account, or nearly so, the general results are quite as important as the means used to accomplish them. * * * As well as I can estimate the intent of the courts, it has been to give the tugs what will be a handsome gratuity, enough to induce prompt and even eager assistance; and this would be enhanced slightly by a great value at risk, though in no important or definite proportion to value."

It would be difficult for any court to declare the whole counsel of the law relating to salvage in clearer or more expressive terms. The court in this district has frequently had occasion to refer to that opinion. The Lyman M. Law (D. C.) 122 Fed. 816; The Lottie E. Hopkins (D. C.) 133 Fed. 405.

As Judge Lowell has said, there is no generic difference between towage and salvage. The same service may sometimes be called by either name; but, when a court decides that the service calls for liberality and holds that a bonus should be given in order to encourage similar services, then such court should properly and strictly call the service a salvage service, for "liberality is salvage, there is no place for liberality in an action of contract." It often becomes material, too, for courts to draw a distinct line between salvage and towage, for the reason that a reward ought sometimes to be given to the crew of the salving vessel and to other participants in salvage services; and such reward should not be given if the services wer held to be merely towage. The J. C. Pfluger (D. C.) 109 Fed. 93.

It ought to be said further that for towage—that is, for merely expediting the voyage—the ship alone can be charged, while the cargo also, as well as the ship, may be brought in for contribution in case of salvage. The definitions of salvage and the distinction between salvage and towage in this circuit have been along the lines stated in the above cases. M. B. Stetson, Fed. Cas. No. 9,363; Adams v. Island City, Fed. Cas. No. 55; Bowley v. Goddard, Fed. Cas. No. 1736; The Lyman M. Law, supra; The Lottie E. Hopkins, supra.

Judge Addison Brown considered this subject in the case of the Colon (McConnochie v. Kerr [D. C.] 9 Fed. 50). He said:

"A salvage service is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger. 'Mere towage service,' says Dr. Lushington (The Reward, 1 W. Rob. 177), 'is confined to vessels that have received no injury or damage; and mere towage reward is payable in those cases only where the vessel receiving the service is in the same condition she would ordinarily be in without having encountered any damages or accident.'" The Plymouth Rock (D. C.) 9 Fed. 413; The Athenian (D. C.) 3 Fed. 248; The Independence, Fed. Cas. No. 7,014; Hennessey v. Versailles, Fed. Cas. No. 6,365; The Apache (C. C.) 124 Fed. 905; The J. C. Pfluger, supra.

My attention has been directed to The Robert S. Besnard (D. C.) 144 Fed. 992, a recent case arising in the South Carolina district, where the court held the service to be towage and not salvage, but showed liberality in the award, and, I have no doubt, did substantial justice. The same court, in The Apache, supra, had employed the reasoning and conclusions in regard to salvage awards which have been adopted by the courts of this circuit. I think, however, that the remark of Judge Lowell in Baker v. Hemenway, supra, that, in a case referred to, "Judge Blatchford had in fact, though not in name, given salvage," applies also to the case of the Besnard; but, however that may be, it is certain that the facts in the Besnard Case are not sufficiently like the case at bar to cause it to serve as a guide.

Under the rules of law in this circuit, I have no hesitation in coming to the conclusion that the service rendered by the Sea King in the case at bar is a salvage service. In my opinion the tug did more than merely expedite the voyage of the schooner. She rendered a prompt, careful, and effective service to a vessel in some apprehended danger. The

schooner was in a position which clearly called for assistance. She was in a leaky condition. She had been pounding upon a ledge for 20 minutes. Her crew found it necessary to pump until the tug arrived, and throughout the voyage to Rockland, until they were exhausted. Without the aid of the tug there is, at least, a possibility that she might not have been able to reach Rockland, against wind and tide, with the water constantly gaining in her hold. Even if she had suffered no great injury by her contact with the ledge, she was clearly in a position where she required aid, and where such aid might possibly be absolutely necessary in order to bring her to a port where she could be beached.

2. What shall be the amount of the salvage award?

This question, as Judge Lowell has said, is the only really important question in a salvage case. It often makes no difference in the result whether the service is called towage or salvage. But it is important that a proper and just award be given. There is no rule which is of much aid to courts in fixing the amount of such award. It is a matter where the spirit of justice and of sense should prevail.

The tug, as I have said, rendered prompt and efficient service. Her captain saw the schooner with a signal calling for assistance. It was not a typical signal of distress, but it was a signal which called for help. He knew that the schooner had sailed, stone laden, from a Penobscot port. He saw that she was in the vicinity of dangerous ledges. How great injury she had suffered, and how great peril she was then encountering, he did not know. For aught he knew, she might be in a sinking condition, in deep water, with 550 tons of stone aboard. It was a time when a thoughtful man would naturally see that he ought to offer aid, or at least to inquire what help was needed. It must also be borne in mind that the master of the tug was in a peculiar situation. He had a large vessel in tow. He was under contract to take her to sea. His contract would not be performed until he had taken her 10 miles further. He might have made the excuse that he was under a contract, and that he would not leave his tow in any peril, however slight. But he made no such excuse. He says that, without any consultation with his tow, he cut loose her hawser and went quickly to the help of the schooner. It is urged by the libelant that, in doing this, he should be rewarded for taking the risk of abandoning his contract and of paying the heavy damages which might result from his tow suffering injury by reasons of the tug's default. This presents an important consideration. It is clear that a tugboat should not be encouraged to leave a tow in great danger, either from bad weather or from the perils of the sea. In The Lyman M. Law, supra, this court held that it could not encourage a passenger steamer, even under exigent circumstances, to endanger her own passengers in order to go to the rescue of a ship. So the court must say in the case at bar that it cannot encourage a tugboat to abandon a contract and expose to great danger the tow to which she is under contract. But, in this case, there were no great perils of the sea, or dangers of the weather, to which the Briery would be exposed. The captain should be encouraged, and should have some liberality shown him, however, because he exercised good judgment under the peculiar circumstances, and did not make his

towage contract, almost performed, an excuse for not heeding the call of the schooner. No rule can be given as to the duty of captains under circumstances like this. They must be held to the exercise of good judgment. Capt. Hathorne did exercise good judgment in the premises. He also exercised a proper spirit of humanity. He should have some reward. The subject of salvage award has been fully considered by this court in The Lyman M. Law, supra. This court there discussed all the elements which ought to enter into the conclusions of the court in reference to the amount of the award. The courts in this circuit have not been in the habit of giving exaggerated bounties, and thereby aiding salvors in devouring what the sea has saved. Here the value of the property now in the registry of the court does not furnish a controlling guide in coming to a conclusion as to what salvage should be paid; nor does the value of the tug rendering the service afford a test. Both elements are to be considered, but awards are often made "on no important or definite proportion of value."

Taking all the circumstances into consideration, I award the gross sum of $450 to the steam tug Sea King, her master, officers, and the members of the crew.

3. It is urged by the respondent that, in the condition of the vessel as shown by the testimony, the libel was unnecessary and was prematurely brought. Some authorities have been shown me bearing upon this contention. I do not think it necessary to discuss the evidence in detail upon this matter. In my opinion the evidence does not show that the libel was prematurely brought, and does not take the case out of the ordinary rule as to costs.

4. The sum of $450 which I have awarded as salvage shall be apportioned between the proceeds of the vessel and the proceeds of the cargo in proportion to the respective amounts thereof. The costs herein awarded are to be divided in the same manner. Out of the $450 awarded, the sum of $25 shall be paid to James A. Hathorne, the master of the steamtug, and the sum of $25 shall be divided among the remaining members of the crew of the steam tug as follows:

| To | Charles Kingsbury, | Mate, | $10 00 |
|----|----|----|----|
| " | Reuben Hammond, | Engineer, | 5 00 |
| " | Chester Oliver, | Cook, | 2 00 |
| " | Carl Steinkamp, | Fireman, | 2 00 |
| " | John Heidenberg, | Fireman, | 2 00 |
| " | Herman Woodside, | Deckhand, | 2 00 |
| " | Jacob T. Wheeler, | Deckhand, | 2 00 |

The above amounts shall be net to the master and crew, free of all counsel fees or other expenses. The balance of the award, namely, the sum of $400, shall be paid to the Knickerbocker Steam Towage Company.

Let a decree be entered in accordance with this opinion, with costs.