## The Oregon.

### Russell and others *v.* The Oregon.

*(District Court, S. D. New York.  May 4, 1886.)*

SALVAGE—FIRE IN OIL-WORKS—TOWAGE—LIGHTERS.

A fire broke out in some oil-works on Bushwick creek, near the East river, within a shed inclosed by a brick wall immediately adjacent to the creek. Several lighters and other boats were moored near the shed. The standing orders of the company were to clear the creek of boats in case of any fire on the premises. There were other combustible materials in different parts of the premises near the shed. Soon after the fire broke out the libelants' tug, of light draught, came to the mouth of the creek, and was immediately

engaged to tow out three lighters partly loaded with naphtha, which were above the fire. The tug did so, devoting about two hours to the entire service. The lighters, with their cargo, were worth about $4,500. *Held,* that the service was not a mere ordinary towage service, but one rendered with reference to the apprehension of danger of fire, and was therefore a salvage service, though of no high degree of merit; and $200 compensation was awarded, one-half to the tug, the other half to the captain and crew.

In Admiralty.

*Hyland & Zabriskie,* for libelants.

*Knox & Woodward,* for claimants.

BROWN, J. During the forenoon of the fourteenth of November, 1884, a fire broke out on the premises of the Pratt Manufacturing Company's Oil-works, in a shed on the south side of Bushwick creek. The shed was about 100 feet long by 45 feet deep, inclosed by a brick fire wall about 20 feet high. When the fire broke out, the lighter Oregon lay outside of a canal-boat which was moored along-side of the shed, and within three feet of it. The canal-boat and lighter were immediately removed somewhat further up the creek; the lighter about seventy-five feet above the shed, and the canal-boat some two or three hundred feet further up. The premises in the vicinity of the shed were employed in the oil business, and there were various tanks in different parts of the grounds not far distant. The general orders of the Standard Oil Company, that control the whole premises, were that, whenever a fire occurred along the creek, the creek should be cleared of boats. The libelants' boat Alpha was towing a schooner down Newtown creek, when, observing the fire, the pilot dropped the schooner at the mouth of the creek, and went down to Bushwick creek, not far below. When he arrived there, he was hailed by the assistant foreman of the premises to come into the creek and tow out the lighters. The Alpha accordingly went into the creek, and succeeded in towing out the three lighters in a line upon a hawser. The Oregon had naphtha aboard; the other two lighters, refined oil. For this service a salvage award is claimed.

Two questions are presented: *First,* whether the service is entitled to salvage compensation; and, if so, the amount.

The rescue of property in danger of destruction by fire is a familiar ground of salvage award, where the essential elements of a salvage service exist. *The Connemara,* 108 U. S. 352; S. C. 2 Sup. Ct. Rep. 754. Such cases have frequently arisen in this court. *The Tampico,* 16 Fed. Rep. 491; *The Baker,* 23 Fed. Rep. 109; S. C. 25 Fed. Rep. 771. As respects the degree of danger, it is not necessary that there be a certainty of loss unless the service were rendered. It is sufficient that there is a reasonable apprehension of danger, and that the service is rendered in reference to that apprehension of danger, and not in the ordinary course of business. *The Raikes,* 1 Hagg. 247; *The Jos. C. Griggs,* 1 Ben. 81; *The Plymouth Rock,* 9 Fed. Rep. 413, 416.

There can be no doubt that the Alpha was not employed in the ordinary course of business, or that the service was rendered as a rescue from danger of fire. The superintendent, indeed, testifies that he did not regard the Oregon as in any position of danger, but altogether safe; that she might have been towed further up the creek, if necessary; and that the request to tow her out was on account of the standing orders to clear the creek, in case of fire. But I cannot doubt that this standing order was promulgated, in part, at least, on account of the danger that any vessels in the creek might be in, as well as to furnish additional room for the work of fire-boats that might be wanted to protect from loss other parts of the premises. A fire in one place might spread to others. The combustible materials all about the grounds were such as to favor the spread of fire; and it could never be certain till the fire was checked how far it might be communicated. The service desired of the Alpha in this case was sought under the pressure of this reasonable necessity, and because the respondent's own boat, the Niagara, which had been expected, did not make her appearance; and the removal of the boats from the creek could not be properly delayed longer under the standing orders mentioned. The fire was already under full headway. Of the many other tugs in the vicinity none but the Alpha was of sufficiently light draught to go upon the opposite side of the creek, somewhat away from the fire, and astern of the fire-boats, which took up a considerable portion of the creek. Under these circumstances, the service was of a salvage character, and not a mere ordinary towing service. The Oregon undoubtedly was not moved as far away from the fire as she might have been moved; but that, no doubt, was because it was expected that she would be taken out of the creek very speedily.

There is much contradiction between the witnesses as to the amount of the Alpha's exposure to the fire. On the libelant's part the testimony is that her deck hands were considerably employed in throwing water upon her house; that the glass of her sky-lights was broken by the heat; and that the neck, face, and hands of two of the persons thus engaged were burned and blistered; and that the paint of the boat was also injured,—her position being for some time opposite to the fire. Two disinterested witnesses who stood on the opposite bank testified to the same effect. Several of the respondents' witnesses say that the Alpha lay lower down in the creek, astern of the two fire-boats, which lay partly athwart the creek; and that the fire-boats lay between the Alpha and the fire. These discrepancies would, in the main, be reconciled if the Alpha, after first going opposite to the fire, and throwing out her lines, had then dropped back astern of the fire-boats; and such may have been the fact,—the libelant's witnesses testifying as to the former position, and the respondents as to the latter.

The services in this case, however, are not of any high degree of merit, considered as salvage services. Though the Oregon had naph-

tha·aboard; she was at such a distance from the fire, and the service was so soon after the fire broke out in the shed within the walls, that I cannot regard the service as one involving much personal danger, although that element is not wholly out of the case. In other respects the service was not one of any special difficulty, or labor, or risk. The damage to the Alpha was slight. Her painting was not repaired until a year afterwards, and then at a slight cost, and this libel was not filed until some five months after the service. The value of the three lighters towed out, with their cargoes, was about $4,500. I think $200 will be a just and fair compensation, (*The Baker, supra; The O. M. Hitchcock,* 25 Fed. Rep. 777; *The Key West,* 11 Fed. Rep. 911; *The M. Vandercook,* 24 Fed. Rep. 472; *The Rialto,* 15 Fed. Rep. 124; *The Grid,* 21 Fed. Rep. 423; *The Mabel,* 22 Fed. Rep. 543; *The Florida,* Id. 617; *The Indiana,* Id. 925;) one half to be paid to the tug, the other half to the captain and crew, in proportion to their wages.