## THE HOLLAND.[1]

## BALTIMORE & O. R. R. Co. *et al. v.* THE HOLLAND.

### *(District Court, E. D. New York.* December 19, 1890.)

SALVAGE—FIRE ON PIER—TOWING ENDANGERED VESSEL—AWARD.

As the steam-ship Holland was lying at her pier, a sudden fire broke out on the side of the pier opposite to where the steamer lay. The officer in charge of the steam-ship requested a tug, lying near, to tow the steam-ship away, and shortly afterwards another tug was signaled by the steam-ship and took another line, but, getting into such a position as to be able to bring but little power to bear, a third tug came to her assistance. Under power of these three tugs, and with two additional tugs keeping her off from the pier, the steam-ship was moved out of danger. The city fire department, with twelve engines and two fire boats, came to the fire soon after it started. The steamer could have been warped across the slip by her donkey engines, which had steam up. The service of the tugs lasted some two hours. With her cargo the steamer was worth $600,000. *Held*, that the service was a salvage service, in which the value of the property saved was great, but the peril moderate, and $4,500 was awarded to the tugs in proportion to their relative merits.

In Admiralty. Consolidated suit to recover salvage.

*Hyland & Zabriskie*, for the Howard Carroll.
*Wing, Shoudy & Putnam*, for the John Fuller.
*Tracy, MacFarland, Boardman & Platt*, for the A. C. Rose.
*Martin & Smith*, for the Henry T. Sisson.
*Peter S. Carter*, for the George L. Hammond.
*John Chetwood*, for the Holland.

BENEDICT, J. This is a consolidated action in which the owners and crews of five steam-tugs seek to recover salvage for services rendered the steam-ship Holland on the 7th day of December, 1889. The Holland was a large steamer belonging to the National Steam-Ship Company which had just arrived from sea and been moored on the north side of her pier in the North river. She had no steam on. With her cargo on board she was concluded to be worth $600,000. About dinner time of the 7th day of December, 1889, fire broke out in the upper deck of the pier-house on the side of the pier opposite to that where the steamer lay. The fire was sudden and proved disastrous, five lives being lost, and the pier-shed for the most part destroyed. As soon as the fire broke out the officer in charge of the Holland determined to move her from the pier, and accordingly requested the tug Howard Carroll, then lying at the end of the same pier, to take a line from the steamer in order to

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

tow her away from the burning wharf. The Carroll at once moved under the bow of the steamer, and took from her a line by which she commenced to tow the steamer. Very shortly afterwards the steam-tug Henry T. Sisson was signaled by the officer in charge of the steamer to take an additional line, which she did, but in so doing got into a position where she could bring little power to bear. At this time the Rose came, and making fast a line to the bow of the Sisson, towed that tug into a position which enabled her to pull upon the steamer. Under power of these three tugs the steamer was moved from her berth to a safe place in the stream. While she was moving, in order to prevent the steamer from being damaged by or doing damage to the pier as she moved out into the ebb tide, the officer in charge of the steamer requested the tug Fuller and also the tug Hammond to push against her port side in order to keep her away from the wharf, the tide then tending to set the steamer against the wharf. In this way the steamer was taken out of danger.

The right of the libelants to recover salvage compensation for these services, although denied in the answer, has been conceded upon the argument. The question submitted for decision relates only to the amount. Manifestly it is a case of salvage, for the steamer was removed from a place of peril to a place of safety by the voluntary efforts of these tugs. While the steamer was undoubtedly exposed to some danger, that danger was not great. The fire department with 12 engines were soon playing water upon the pier. Two fire boats made their appearance in the slip, and the result seems to indicate that their efforts would have been sufficient to prevent the steamer from receiving any considerable damage if she had remained at the wharf. Still there was risk, for it could not be known at the outset to what extent the fire would reach, and it was dangerous. The risk was considered by the officer in charge sufficient to require her removal from the pier. It is also evident that if these tugs had declined to take the steamer into the stream she could have been warped across the slip to the pier above, and so out of danger. For, although she had not steam upon her engines, her donkey boilers had steam and could have been used to work the winches. It is a case, therefore, where the value was large, but the peril was moderate. Moreover the services rendered by these tugs was short in duration, not exceeding two hours. It was not extraordinary in character, and involved no risk to them. Nevertheless, being a salvage service, the tugs are entitled to more than common towing compensation. In my opinion the sum of $4,500 will be a proper salvage award in a case like this. In apportioning this amount among the five tugs it is to be noticed that it is conceded that the service was requested by the officer in charge of the steamer in the case of every tug except the Rose. In regard to the Rose the testimony of the claimants' witness shows that the Rose rendered a necessary service in taking hold of the Sisson and pulling her into a position where she could tow the steam-ship to advantage. Many witnesses testify that the officer by signals directed the Rose to help the Sisson. The officer in charge of the steamer says that he made

signals to the Rose not to take hold.    But as the Rose at once gave a line
to the Sisson the officer thinks, as he says, that his request was misunder-
stood.    If it had appeared that the Rose had intentionally taken hold
in opposition to the known direction of the officer in charge of the
steamer I should have refused her any compensation, but that cannot
be found to be the fact upon the evidence.    The Rose was the most pow-
erful and valuable of all the tugs, but the service rendered by her was sim-
ilar to that rendered by the Niel, for which no claim is made.    In so
far as the effort of the Rose enabled the Sisson to get into position, it
was valuable, but beyond getting the Sisson into position her services
were unnecessary.    The Niel left when the Carroll was put in position,
and the Rose could have left when the Niel did without interfering with
the relief of the steamer.    Under all the circumstances I allow to the tug
Howard Carroll, her officers and crew, the sum of $1,250; to the tug
John Fuller, her officers and crew, the sum of $800; to the tug Henry
T. Sisson, her officers and crew, the sum of $1,000; to the tug George
L. Hammond, her officers and crew, the sum of $650; to the tug A. C.
Rose, her officers and crew, the sum of $800.