## THE APACHE (two cases).

### (District Court, E. D. South Carolina. July 15, 1903.)

**1. SALVAGE—WHAT CONSTITUTES SALVAGE SERVICE.**

Any service rendered to a vessel in peril or distress which in any measure conduces to its safety is in the nature of a salvage service, and is to be compensated as such, unless the claimant pleads and proves a binding contract that the work done should be paid for at all events; and such service is none the less a salvage service because the peril apprehended did not befall, or because the labor expended was insignificant, and performed without actual risk, such considerations affecting only the amount of the compensation, and not the principle on which it is awarded.

**2. SAME—COMPENSATION—SERVICES CONSIDERED.**

The steamship Apache, a new vessel, worth from $200,000 to $350,000, and carrying a cargo valued at $50,000, was injured in a collision in the night when entering Charleston Harbor, having a large hole knocked in the side, which caused one hold to immediately fill. She was beached by her master about 500 feet away from the main channel inside the jetties, and within the harbor limits, but about 5 miles from the docks. In the morning two tugs went to her assistance. They assisted in pumping her out, and at high tide made an unsuccessful attempt to pull her off into deep water. About five days later, a patch having been procured and put on, she was again pumped out and floated, and then taken to the city by the tugs. She was at no time in serious danger of sinking, having six water-tight bulkheads, five of which were uninjured; nor did she settle in the sand. The weather was mild, and the sea calm, the highest velocity attained by the wind being 30 miles an hour for a short time only. She was protected from the open sea by the jetties. During the five days the tugs remained and were used in taking the passengers to the city, going on errands, and doing such service as was required, but initiating no plans for relieving the ship, and rendering no services which involved danger. They were not equipped for wrecking purposes, but were engaged in towing, were worth from $20,000 to $30,000 each, and their ordinary hire was worth from $75 to $100 per day. *Held*, that they were entitled to compensation as salvors, but, in view of the fact that the ship was not in great peril, and that the service was not dangerous nor arduous, an allowance of $1,500 each was as large as could justly be made.

**3. SAME—SUIT TO RECOVER FOR SERVICES—EXORBITANT DEMANDS.**

An award for salvage services will not be abated because of the exorbitant demands of the salvors made before suit, where their libel demanded no particular sum, and they did not attempt to hold the vessel, but permitted her to go, and agreed to accept a bond to be fixed by the court.

In Admiralty. Suit to recover for salvage services.

Nathans & Sinkler and Mitchell & Smith, for libelants.
Bryan & Bryan, for respondents.

BRAWLEY, District Judge. These libels for salvage were, by order of the court, consolidated for the purpose of taking testimony and entry of final decree, but the interests of the libelants remain distinct, and have been separately presented to this court. They are for services rendered to the Apache, a large and valuable steamship

¶ 2. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

belonging to the Clyde Steamship Company, and plying regularly between the ports of New York, Charleston, and Jacksonville. On the morning of October 9, 1902, on her way from Jacksonville to Charleston, with about 20 passengers and two-thirds of a cargo, she was struck by the steamship Iroquois, of the same line, on her port side, about 30 feet abaft her stem, and a hole about 20 feet wide on her main deck and about 10 or 12 feet wide at the water line was driven into her, and her No. 1 hold was almost immediately filled with water. The collision occurred at half-past 2 o'clock a. m., at about high water, in the main channel, about two miles from the entrance of the jetties. Her master, not then knowing the extent of his injuries, immediately thereafter ran her on the flats or sand bar to the north of the main channel, where she lay during the period covered by the services for which compensation is now sought. The Apache is an iron steamship, about three years old, about 350 feet in length, and testimony of libelant fixes her value at $350,000 and for the claimant at $200,000. It is agreed that her cargo, consisting of cross-ties, naval stores, and cotton, was of the value of fifty or sixty thousand dollars. Revel, managing owner of the Waban, was summoned by telephone between half past 3 and 4 o'clock on Thursday morning, October 9th, by Nickerson, the superintendent of wharves of the Clyde Company, to get the Waban ready, and render assistance. He immediately got up and went down to the tug, where he met Nickerson and Mansfield, the head stevedore of the Clyde Company, with some longshoremen, and they went down to the ship, arriving there between 5 and 6 o'clock. His testimony is that Nickerson, on the way down, said, "We will make no agreement for this work; we will go down and render what assistance we can to the ship;" and that he replied, "All right." Nickerson's testimony is that he met Revel on the wharf, and told him that: "We would go out to the Apache; that she was beached; and told him that we wanted to use the tug. I told him it was not a question of salvage, but simply by the hour or by the day, as we needed him;" and that Revel replied, "All right." Igoe, the master of the Protector, heard of the disaster from Revel about half past 4 o'clock, and immediately went down on his tug to the ship, arriving about 6 o'clock, and asked Bearse, the master of the Apache, if he wanted any assistance, to which he replied that he wanted some lighters, but did not want the tug; that he would send the Waban for the lighters. The price for the lighters—$50 each per day—was agreed upon. Shortly afterwards Bearse informed him that he would take both the tugs, but nothing was said as to compensation for the use of the tug. The Waban was sent up to the city with passengers, and the Protector was sent to bring down the lighters. Shortly after the Waban returned to the ship, she commenced pumping in the fire room, and continued pumping until about 1 o'clock. A more detailed consideration of this service will be had hereafter. The Protector did no pumping on that day, and at 1 o'clock the pumping ceased, and, it being then about high water, an attempt was made to pull the ship off, both tugs pulling at the stern and the ship using her own power. This effort was unavailing. The tugs are described as first-class towboats. They

had no wrecking cables or kedges or other wrecking apparatus. The tugs remained in attendance upon the ship, carrying messages and officials to and from the city, and towing lighters whenever called upon, which lighters were loaded by the stevedores of the ship until Sunday night. By that time Pregnall, who had been employed for that purpose, had made a shutter or patch, designed to cover the hole in the ship, and after this patch was applied both tugs and the pumps of the ship commenced pumping out No. 1 hold, but, after pumping about an hour, it was discovered that the patch was not sufficiently tight, and it was taken off, and some additional mattresses, furnished by the ship, were battened on it, and on Monday morning it was again put in place, and the hole so far made tight that pumping was again resumed. A large pump furnished by Pregnall, the ship's pumps, and the pumps on the tugs succeeded at about half past 12 o'clock in pumping out the water from hold No. 1, when the ship floated, and the tug Rescue, of the Merritt Company, which had been summoned from Norfolk (a large and powerful wrecking tug, equipped especially for wrecking purposes), and had arrived on the scene the afternoon before, towed the Apache up to the city, where she was put upon the sand bar near the Battery until she could be repaired so as to resume her voyage to New York. In coming up to that point the two tugs were lashed alongside, using their pumps and backing, the ship being brought up stern foremost. The services of Pregnall and of the diver employed by him and of the tug Rescue are not involved in this case. The lighters have been paid for, and the sole question is as to the proper remuneration to be awarded to the libelants for services thus briefly related, and which will be considered later more in detail.

The first point to be determined is whether, as contended by the claimants, these services are to be considered in the light of mere harbor service, to be compensated upon a quantum meruit with a bonus, or whether they should be considered in the light of a salvage service, where the award should not rest upon the narrow ground of mere compensation pro opere et labore, but upon the larger policy of the maritime law, looking to merit and effort and peril in the duty of encouraging assistance in cases of distress. Any service or assistance applied for or received by a vessel in peril or distress which in any measure conduces to its safety is in the nature of salvage service, and is to be compensated upon principles more liberal than ordinary work. This rule of the maritime law is not established for the benefit of individuals, but rests upon the sound principle that it is to the general advantage of all interested in property exposed to the perils of the sea that sufficient inducements should be held out to all who are in position to render aid to make extraordinary exertions to save such property from peril. To displace a claim for salvage, it is necessary that parties who seek the protection of any other rule of compensation should plead and prove a binding contract that the work done shall be paid for at all events. It is none the less a salvage service that the peril apprehended did not befall, or that the labor expended was insignificant, and performed without actual risk. These considerations affect the quantum of compensation, but not

the nature of the service, or the principles by which that compensation is to be measured. I am of opinion that the claimants have failed to prove a binding agreement which would displace the claim for salvage, and that compensation for the services rendered must be tested and measured by the rules and principles which usually govern in salvage cases.

The case is not one which presents much difficulty. The witnesses were all examined before me, and, while there was a disposition on the one side to magnify, and on the other side to minimize, the services and the dangers, which is always to be expected where the interest or basis of witnesses gives color to their testimony, there is no room for any reasonable doubt as to the essential facts.

1. As to the location of the ship. She was put ashore by her master on the sand bank, about 500 feet from the main channel, at a point about 2 miles from the mouth of the jetties, and inside of the jetties, sheltered to the north by Sullivan's Island, to the east and northeast by the jetties, which were submerged at the Sullivan's Island end, with Morris Island to the southwest, and about 5 miles from the wharves of the city. The testimony is that fishing boats and pilot boats were accustomed in bad weather to come inside the jetties for safe anchorage, and to lie about that point. It is within the coast survey chart of "Charleston Harbor and its approaches."

2. The greatest velocity of the wind at any time while she lay there was on Friday afternoon, as appears by the official weather report, and that was 30 miles an hour, with decreasing velocity Friday night. In the scale of wind printed in the official newspaper weather report every morning, which was offered in evidence, light wind is 1—10 miles an hour; fresh wind, 10—20 miles an hour; brisk wind, 20—30 miles an hour; high winds, 30—40 miles an hour; gale, 40—60 miles an hour; hurricane, 60 miles and upwards. The hurricane season in this latitude had passed, although there is one notable instance of a cyclone late in October. The testimony of all the seafaring men aboard the ship is that there was at no time more than a brisk wind, and that was on Friday afternoon. The greater part of the time there was a light or fresh wind. Two photographs were offered in evidence—one taken on Thursday at 3:15 p. m., and the other on Friday at 4 p. m. They have the appearance of a ship lying in a summer sea; and in the photograph on Friday afternoon, when the wind was 28 miles an hour, according to the chart, and within 2 miles of the highest velocity, a small fishing boat appears near the ship, with full sail, standing up straight. It thus clearly appears that the ship was in no actual danger from high winds at any time while she was aground.

3. The ship had six iron bulkheads, extending to the upper between-decks: First, the collision bulkhead, which was 24 feet from the stem, uninjured by the collision; the second 100 feet from the first; the third 53 feet from the second; the fourth 43 feet, the fifth 28 feet, and the last 20 feet, from the stern post. The collision occurred in the channel in deep water, and the blow, 20 feet wide on the main deck and 10 or 12 feet on the water line, caused No. 1 hold to fill immediately. That she did not sink at once is proof that her

other bulkheads were intact, and that she had floating capacity enough to keep her from sinking. No 1 hold is 100 feet in length, and the testimony is that at no time did the water rise to within more than 5 feet from the top of the forward bulkhead. There was a leak in the bulkhead separating No. 1 and No. 2 holds. No testimony was offered as to the cause of this leak, except that it was supposed to be due to the starting of some rivets, and the water rose in No. 2 hold five to seven feet. Both holds, No. 1 and No. 2, were filled with cross-ties, naval stores, and cotton. The testimony of all the experienced seafaring men is that the ship, with all her other bulkheads intact, loaded, as she was, with lumber and other floatable cargo, would not have sunk if she had been in deep water. The most conclusive proof that such was their opinion at the time, and not a mere opinion formed after the fact, is found in the efforts which were made on Thursday to pull her off into deep water and bring her to the city, for it is not credible that such efforts would have been made if there was any apprehension of her sinking. My conclusion, therefore, is that she was in no danger of sinking from the water which was in her, first, because, by the law of her construction, with five water-tight bulkheads unimpaired, she was designed to float notwithstanding the filling of one or two of her holds; second, because she did not sink immediately after the collision, when her No. 1 hold must have filled immediately; third, that is the testimony of all the experienced seafaring men who were aboard of her, supported by the fact that her master, an intelligent and capable navigator, endeavored to pull her off and put her in deep water; fourth, because the character of her cargo was such as to add to her floating capacity.

The next danger to be apprehended in the position where she lay was that from defective bulkheads, or otherwise, she would take in more water. The testimony is abundant and conclusive that the highest water in her was never nearer than five feet to the top of her bulkhead, going down when the tide was low and rising with the tide, and no witness has testified that there was any material change. As already stated, there was a leak from some unexplained cause in the bulkhead separating No. 1 hold from No. 2 hold, and the latter had five to seven feet of water. The testimony of the engineer of the Apache, an uncommonly intelligent witness, is that he attempted to pump out No. 2 hold with his donkey pump, having two suctions there; that, finding that this did not keep the water down, he opened the sluice gates from No. 2 hold into the fire room hold, so that he could use the other suctions from the donkey pump connected with the fire room bilge, in addition to the suctions in No. 2 hold; that the water in the fire room was always under his control by the use of the sluicegates, which were worked from the main deck by a rod, and opened and closed at his pleasure, and that at no time was it higher than $2\frac{1}{2}$ feet from the skin of the ship. No other witness has contradicted this testimony, for no one else saw it, and he further testifies that there was no danger at any time of the water getting to the furnaces and fires, and that the ship's engines were always at work. That the ship's engines were at all times working there is no doubt. In addition to the donkey pump, the ship had a circulat-

ing pump and a sanitary pump. These had no direct connections with the fire-room hold, and, in order to use them, the sluices connecting the fire-room hold with the engine-room hold had to be opened; but the engineer testified that he did not wish to let the water by that method into the engine room, because he did not wish the dirt and slime in the engine room, but in case of any danger or necessity he could have done so, and controlled easily all the water that could thus have entered. To avoid bringing the water into the engine room, he sent to the city on Thursday, and got a pipe through which he made connection for his sanitary pump through the fire-room bilge, thus being able to use his sanitary pump, as well as his donkey pump, in pumping water from the fire room. The testimony is that the capacity of the donkey pump was 285 gallons per minute, and of the sanitary pump 117 gallons per minute. The circulating pump had a capacity of 4,200 gallons per minute, but it appears that that pump was not used in pumping water from the ship. After the unavailing attempt to pull the ship off, commencing Thursday afternoon at 1 o'clock, high tide, Bearse, the master, who had in the meantime sent for a diver, determined that the only thing to do was to put a patch on the ship over the hole, and a ship carpenter was employed to make such a patch, and the tug Protector was used to put out one of the ship's anchors. On Friday night, on the high tide, when the wind veered, the ship swung around on her forefoot on the sand as on a pivot, and, from heading north, lay henceforth heading east by south, not pulling on her anchor, and lay henceforth in that position. Pregnall, the ship carpenter, finished the shutter or patch or cofferdam, as it is variously called, on Sunday, and on Sunday afternoon it was carried down to the ship, and with his diver and the ship's crew the patch was put in position over the hole, and an attempt was made to pump out the No. 1 hold, the tugs assisting in the pumping; but when it was discovered that the patch was not tight, the pumping ceased until the next morning, when, the patch having been made tight, pumping was resumed. A large pump had been obtained from Pregnall with a capacity of 1,283 gallons per minute at 50 revolutions, doubled at 100 revolutions. The capacity of the ship's pumps, the donkey and the sanitary pump, has been already stated. The pumps of the Waban and the Protector are of about the same capacity, and the testimony as to their capacity is somewhat confusing. The exigencies of the case do not seem to require that this point should be determined with mathematical accuracy, and, although there is some testimony that the Waban's pump was defective, because it had no air chamber, I am of opinion that the two tugs together were able to pump somewhat more than the two pumps of the ship which were in use, and somewhat less than Pregnall's pump. The pumping on Monday commenced at 10 o'clock, and was continuous until 12:30, when the water in No. 1 hold was so far pumped out that the ship floated. This service was attended with no risk whatever, as the wind was light. The tugs remained by and lashed to the ship until she was pulled up to the hard off the Battery on Monday afternoon, the tugs pumping on the way up. During the remainder of the time the tugs lay by or

near the ship, carrying messages or officials to and fro, and carrying lighters when called upon. It is not claimed in behalf of the tugs, or proved, that they devised any plans for the salving of the ship, or made any suggestions looking to that end. They obeyed all orders that were given, and did all that they were told to do.

The case for the claimants is that the tugs, which had frequently theretofore been employed by the steamship company in harbor service, were hired for such services as were needful, with the understanding that they were to be paid for at the customary rates; that they were used in such services as were demanded of them as a convenience, and not as a necessity; that the ship could have put her passengers ashore in her own boats on Sullivan's Island, where there was a trolley line; that with her own pumps and with the pump hired from Pregnall she could have pumped herself out; that with her own boats she could have laid the anchor which was carried out by the Protector, and with her own steam she could have taken care of herself where she lay, and come to the city; and that the only service rendered by the tugs that she could not do herself was in towing lighters to the city, which lighters were loaded by her own stevedores, at her own expense, and that she was at no time in actual peril.

The case for the libelants is that on Thursday morning the ship was in danger of the water getting into her engine room and putting out her fires, and of thus being rendered helpless; that she was at all times in an exposed position, in danger from winds and seas; that she was in danger of sinking into the sand; that she was in danger of getting off into deep water, where the services of the tugs would be needful; and that their pumps materially contributed in getting the water out; and as material evidence tending to show that the ship was in danger they point to the fact that on Saturday a wooden bulkhead was erected on the main deck aft of the forward hatch, which could only have been done in the apprehension that the ship would sink to a point below that to which the iron bulkheads extended, and as further evidence of apprehended danger they point to the summoning of the Merritt wrecking tug Rescue. These various contentions will be considered in order.

(a) As to the pumping on Thursday morning, I find nothing in the appearance or manner of the engineer, Tinnerholn, to lead to the conclusion that he was not truthful in his testimony as to the water in the fire room, which, as already related, is that this water was brought there by him from No. 2 hold, through the opening of the sluices, and for the purpose of pumping it out, and thus lightening the ship preparatory to the attempt to pull her off. It is hardly conceivable that there could have been any imminent danger from that quarter without Capt. Bearse being apprised of it, for he testifies that when he saw the Waban pumping he asked the engineer why he was doing it, and he said, "As the boat was lying there doing nothing, and he supposed she was employed by the ship, he used her pumps as a convenience to assist him in pumping the fire room out." This pumping by the Waban did not commence until 10 o'clock, and, if there was imminent danger, it is not to be believed that he would not have been put to work at an earlier hour, or that the Protector, which had equal

facilities with the Waban for pumping, and which arrived at the ship about 6 o'clock, should not have been put to pumping, instead of being sent off to the city for lighters. All these considerations tend to confirm the credibility of the engineer.

(b) The danger to the ship from seas and winds has already been stated.

(c) As to the erection of a wooden bulkhead across the forward hatch, this was done under the direction of Selden on Saturday, when he arrived aboard the ship, and the reason given for it in his direct testimony was that "it was put there to guard against any possible danger that might arise from anything that we knew not of." In his cross-examination, in reply to questions evidently tending to that end, he gave some frivolous explanations of the possible uses of this wooden bulkhead; but it is evident that the witness, who was a nervous old gentleman, and who, as he testifies, was finding fault with everybody and everything, in his anxiety to get the ship off, testified correctly in chief that this bulkhead was put there to guard against any possible danger that might arise from any unknown cause. It was removed the same day by Capt. Pennington, the port captain of the line, a weather-beaten mariner of large experience, and who had, since his retirement from the command of ships, considerable experience in the wrecking business. He regarded the bulkhead as unnecessary and useless, and it was removed.

(d) As to the danger of the ship settling, this was not one of the dangers alleged in the libel, but some testimony has been adduced upon the point, mainly that of Smith, the diver, who says that he examined the ship at the point of collision on Saturday, and again on Monday; that on Saturday the rent or hole was $4\frac{1}{2}$ feet above the sand, and on Monday, when he put the patch on, the hole was about 6 inches above the sand. He does not testify as to whether there was any accumulation of sand on the other side of the ship, or forward or aft the hole. The testimony of all the witnesses on the ship is that she did not sink or settle in the sand, and the probability is that the deposit of sand described by Smith was caused by the moving sands arrested by the current striking the side of the ship. As it has not been suggested or proved that the tugs did anything to ward off this danger, or could have done anything if it had supervened, it is difficult to see how the fact, if fully proved, would enter as an ingredient in fixing the value of the salvage service. That the ship did not settle was proved by the event, for, as soon as the water was out of the hold, she floated. The danger of the ship sinking has already been considered, and it has not been proved that the tugs did anything or could have done anything to prevent her sinking, and one of the ingredients of the salvage services claimed is the attempt to pull her off on Thursday, when, if this contention is well founded, they would have moved her from a place of safety to a place of danger. The ship could not have been in danger of settling in the sand and of slipping off and sinking in deep water both at the same time.

(c) The sending for the Merritt tug Rescue is adduced as evidence that the officers of the ship considered it in peril. After the demonstrated inability of the libelant tugs to pull the ship off on Thursday,

it was apparent to those on board that some greater and other facilities were needed in the salving of the ship than those which the two tugs would afford, as they had no wrecking apparatus, no cables or kedges, and had exhausted their efforts on Monday at high tide. If she was to be pulled off, a wrecking tug with all of the wrecking apparatus would be needed. If she was to be patched and floated, something more was needed to enable her to make her voyage to New York than the temporary wooden patch provided by Pregnall. The wrecking tug Rescue was provided with all of the needed apparatus for these two purposes, and, as a matter of fact, she did provide an iron patch, which was put on after the ship was brought up to the city, thus enabling her to go safely to her home port.

From the foregoing review, it clearly appears that none of the ingredients which justify a large award entered into this service. There was no imminent peril from which the ship was rescued; no risking of lives to save property; no going out into tempestuous weather, for the thermographic record of the weather bureau shows that the weather was mild and balmy, the maximum temperature 82, minimum 59; nor was there any severe labor, any expenditure of skill or ingenuity in devising or suggesting plans for saving the ship; in fact, nothing to distinguish the services here from ordinary harbor and towage services, except the fact that they were rendered to a ship in distress. That the Apache was a ship in distress, lying aground, with a gaping wound in her side, her main hold flooded with every tide, is a fact not disputed; and that she was in some degree of peril is also clear, for, although the protecting arms of the jetty saved her from the fierce grip of the sea, and technically, perhaps, within the harbor limits, she was in an exposed position; and although in some degree self-helpful, the fact that she kept the tugs near her indicated that she felt the need of them. In salvage, as in life, "they also serve who only stand and wait." It is the policy of the maritime law to encourage spontaneous services rendered in going to the aid of a ship in distress by giving some remuneration beyond the value of the work actually done, as an encouragement to induce the salvor and future salvors to incur risk in saving life and property; but this extra remuneration is always proportioned to the risks encountered and the services actually rendered, and it is never the policy of the law, nor in accordance with justice, to allow a situation created by calamity to be converted into an opportunity for extortion.

It remains only to fix the amount of the award. There is no precise rule or criterion by which that is to be measured, and it rests largely in the conscience and legal discretion of the court, enlightened, as far as it may be, by the decisions in other cases; but, as no two cases are precisely alike, this is an uncertain light. Two cases have been pressed upon the attention of the court: The George W. Clyde, 86 Fed. 665, 30 C. C. A. 292—where a schooner, badly injured by a collision, was in apparent danger of sinking immediately in water 60 or 80 feet in depth. Two tugs, happening to be near, took her in tow, and safely beached her about a quarter of a mile away in less than a quarter of an hour, and a reward of $1,000 for salvage services was made by the District Court and confirmed by the Court

124 F.—58

of Appeals. In the case of the Apache she was safely beached by her own exertion before the tugs came to her assistance. In other words, the service of the tugs commenced here at the point where in the case of the Clyde the services ended; the imminent danger, if there was any, being over. In the case of The Flottbek, 118 Fed. 954, 55 C. C. A. 448, the ship was driven by a gale to dangerous proximity to rocks and reefs near Cape Flattery, on the Pacific Coast, on the night of January 13th, and the steamship Mateawan, soon after daylight on the morning of the 14th, responding to signals of distress, attempted to take her in tow in a raging storm, but, finding that he could not rescue her without endangering his own vessel, her captain went on his way, promising to send relief, and on the night of the 14th the steam tug Holyoke was dispatched from Seattle to her relief, and, being joined by the tug Wanderer, the two proceeded towards the cape, encountering heavy seas, which disabled the machinery of the Holyoke. The steam tug Tacoma joined the Wanderer, and arrived in the vicinity of the Flottbek on the morning of the 16th. By that time the mate and half the crew of the Flottbek had abandoned her, reaching the land in a lifeboat. The distress signals were flying when the tugs arrived. The wind had abated, but there was a heavy sea. The finding of the court below that the ship, when rescued, was in a position of great peril, was sustained by the Court of Appeals, and the reward of $22,830 was reduced one-third by the Court of Appeals. The circumstances have no analogy to those now under consideration. The case of The Excelsior (D. C.) 19 Fed. 436, has more likeness to that now considered than any which has been brought to my attention. There a large passenger and freight steamer, after passing Sewell's Point on her way out of Norfolk, came into collision with a tugboat, which drove a hole into her hull some 8x10 feet in dimensions. Her master beached her on Hampton Bar. She had filled with water, the sea coming over her main deck. She was entirely helpless, and the court held that the danger of possible destruction of her, though not certain, was imminent. The salvage service was rendered by the Baker Salvage Company with great energy, promptitude, skill, and success. The ship and all of her cargo, of the value of $160,000, was saved. The award was $6,000, by Judge Hughes, who was noted for great liberality in salvage cases, and who repeatedly held that salvage services on the South Atlantic Coast ought to be more liberally rewarded than farther north, owing to the greater dangers and fewer facilities; and the fact that the Baker Company was the only fully equipped wrecking company available, and that it maintained at great expense an ample outfit of divers, wrecking vessels and apparatus, is commented on as an inducement to a larger reward. In the case of The Excelsior all of the work of the moving the cargo, providing divers, patching the hole, and lifting the ship, which was submerged, was done by the salving company. In this case the tugboats had no special equipment for salvage purposes, and earned their livelihood in their regular avocation as towboats. The value of the property here is about double that in The Excelsior, but there is a much greater disproportion in the nature and value of the services rendered.

I find the value of the tugs to be from $20,000 to $30,000 each, and that a fair remuneration for ordinary towage services would be $75 or $100 per day. In view of the promptness with which they went to the assistance of a vessel in distress, of their abandoning all other work, and standing by her, ready and willing at all times to render such assistance as was demanded, I am of opinion that an award of $1,500 each would be a fair remuneration. The sum of $1,250 apiece was offered by the claimant, with an intimation that, for the sake of a settlement, they would pay $1,500 each. If that sum had been tendered or paid into court, costs would have been denied to the libelants. As it was not done, costs must follow the decree.

I am asked to abate the award, in view of the exorbitant demands of the libelants, and authority is cited in support of such request. The demand of $25,000 made by the libelants was unconscionable, and grossly exorbitant, and, if it had been followed by an attempt to hold the ship, I would not hesitate to diminish the award on that account; but the testimony shows that the ship was allowed to sail upon the written assurance of her proctor that he would give whatever bond was required, and the amount of the bond was fixed by the court at $15,000. This amount was fixed by it upon the allegations in the libels, many of which have not been supported by the testimony, but, as no specific sum was demanded in the libels, I am of opinion that this is not a case where I would be justified in diminishing the amount, which I consider fair and just, because of demand made before the libels were filed.