## THE LOWTHER CASTLE.

(District Court, D. New Jersey. April 6, 1912.)

**1. SALVAGE (§ 1*)—TOWAGE (§ 1*)—DISTINCTION BETWEEN "SALVAGE SERVICE" AND "TOWAGE SERVICE."**

· A "salvage service" is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger, either present or to be reasonably apprehended, while a "towage service" is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 1, 3, 4; Dec. Dig. § 1;* Towage, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 7, pp. 6316–6318; vol. 8, p. 7018.]

**2. SALVAGE (§ 26*)—NATURE OF SERVICE.**

The value of a service performed is not to be estimated in the light of subsequent events, but of the facts which seem to surround it at the time.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 57–64, 68, 84; Dec. Dig. § 26.*]

**3. SALVAGE (§ 47*)—TOWAGE (§ 8*)—ACTION FOR COMPENSATION—ISSUES AND PROOF.**

· Where the nature of a service rendered was in fact salvage, the burden rests on one who claims it to have been a towage service to plead and prove a binding contract for the towage.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 121; Dec. Dig. § 47;* Towage, Dec. Dig. § 8.*]

**4. COMPROMISE AND SETTLEMENT (§ 17*)—SALVAGE SERVICE—RIGHTS OF CREW —SETTLEMENT BY OWNER.**

While the owner of a vessel which has performed a salvage service may settle for the vessel's share in the compensation, he cannot exclude the crew from obtaining theirs.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 66–74; Dec. Dig. § 17.*]

**5. SALVAGE (§§ 13, 34*)—NATURE OF SERVICE—MOVING VESSEL FROM FIRE— "SALVAGE SERVICE."**

Respondent steamship was moored to the pier of an oil company, extending from its yards in which there were a large number of tanks, when one of the tanks exploded with great violence, the oil became ignited, and created a large fire. The tank was about 1,400 feet from the vessel, but there were other tanks between and 15,000 cases of oil on the pier awaiting loading on the ship. It was dark, and the engines of the vessel were not connected with the steam. *Held,* that the services of a tug which towed her away to a safe place of anchorage were sal-

vage services, although the fire did not in fact reach the pier, and that the crew were entitled to recover salvage in the sum of $600; the owner having settled his claim.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 23–25, 80–83; Dec. Dig. §§ 13, 34.*

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit by John J. Wilson and others against the steamship Lowther Castle. Decree for libelants.

McDermott & Enright, for libelants.
Convers & Kirlin, for claimant.

RELLSTAB, District Judge. Libel by the captain and crew of the steam tug James A. Garfield against the British steamship Lowther Castle for services rendered in towing her from pier 3 of the Tide Water Oil Company at Bayonne, N. J., on November 19, 1910, shortly after an explosion of one of the oil tanks of such company, and during the conflagration that ensued. Libelants claim that the services thus rendered were salvage services, while the claimant contends that they were mere towage, for which a settlement had been made with the owner of such steam tug by the payment of $100.

[1] "A salvage service is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger." McConnochie v. Kerr (D. C.) 9 Fed. 50, 53. Assisting a vessel "in a situation of actual apprehension, though not of actual danger," is salvage. The Raikes, 1 Hagg. 247; The Phantom, L. R. 1 Adm. 58; The Joseph C. Griggs, 1 Ben. 81, Fed. Cas. No. 6,-640. "The degree of danger is immaterial in considering the nature of the service." The Westminister, 1 W. Rob. 232.

[2] "The value of a service performed is not to be estimated by the light of subsequent events, but of the facts which seem to surround it at the time." The Young America (D. C.) 20 Fed. 926. See, also, The Plymouth Rock (D. C.) 9 Fed. 413; Long v. The Tampico (D. C.) 16 Fed. 491; The Oregon (D. C.) 27 Fed. 871; The Holland (D. C.) 44 Fed. 362; The John Swan (D. C.) 50 Fed. 447; The John L. Brady (D. C.) 109 Fed. 912; The Barge No. 127 (D. C.) 113 Fed. 529; The Apache (C. C.) 124 Fed. 905.

The steamship, a steel built vessel of about 2,960 tons register, 370 feet long, and valued at about $110,000, had been moored at this pier for several days when this explosion occurred, awaiting a cargo of refined oil. Upon the pier, built of wood, awaiting shipment, were about 15,000 cases of such oil. The winches, but not the engines of the steamship, were connected with her steam. Her movements, without external aid, therefore, depended upon her winches and lines, and this was limited to her being warped along the pier. The Tide Water Oil Company had a number of oil tanks, large and small,

upon its property, in which were stored oils of different degrees of combustibility. These were in close proximity to the exploded tank. Adjoining its property was the storage yard of the Standard Oil Company, upon which there were an even greater number of tanks of such oil. The explosion occurred about 10 minutes to 6 in the evening. The shock was terrific, breaking the glass in windows of the buildings on the Tide Water Oil Company's property and in the immediate neighborhood, and upon the steam tug which at that time was moving through the Kills, along which such oil storage yards fronted. With the explosion, the oil in the exploded tank ignited and burst into huge flames, emitting a dense smoke. The pier was about 1,400 feet south of the tank which exploded. Between were a number of other tanks filled with oil, and several brick buildings, and a shed at the shore end of the pier. The nearest brick building was three stories in height, and obstructed the view of the extent of the fire from the water front. The explosion brought the chief officer of the steamship on deck, who, in the absence of the captain, immediately took steps to warp the steamship along the pier and out into the stream. Its position was headed inshore, its stern being flush with the outer end of the pier. The tide was ebb near the flood turn—a condition more likely to impede than help the vessel's movements, making it extremely doubtful that it could have reached midstream unaided.

While in the midst of these preparations the steam tug arrived, and was immediately engaged to tow her out into the stream. The fire force of the Tide Water Oil Company, of about 500 employés, fought the flames alone until after 8 o'clock, when an alarm was sent in for the Bayonne fire department, which joined in fighting the fire until after midnight. As it subsequently proved, the steamship was not in any imminent danger, and could have remained at her moorings with safety. This, however, as noted, does not prevent the services rendered from being salvage services, as the situation confronting the steamship at and immediately after such explosion was one of reasonable apprehension of danger. The John Swan, supra. When the explosion occurred, it was already dark. The shock, the leaping flames, the dense smoke, presented a spectacle calculated to engender fear in the minds of any ordinarily prudent person having charge of a vessel moored at a nearby pier; and the master of the steamship acted with commendable prudence in determining to move his steamship out of harm's way, and in availing himself of the more prompt and efficacious method of accelerating the removal of his vessel afforded by the steam tug which came to his relief in a few minutes after the explosion occurred. His movements were handicapped by a shortage of steam power and disconnected engines. The slower his movements, the longer he would remain in the proximity of the fire and the combustible oils in the yard tanks and in the cases on the pier. Until it was certain that the fire could be confined to the immediate area where it had its origin, there was danger of other tanks exploding and the fire reaching the pier and the vessel.

Under such conditions, it is unwarrantable to say that there was not a reasonable apprehension of danger to the steamship. The reasonableness of the apprehension is not to be read in the light of what was subsequently ascertained, but of the circumstances at the time when an immediate judgment had to be formed and executed. The nearness of the exploded tank to others containing a like combustible material, the existence and degree of effectiveness of any barriers between the tanks on fire and those near by, and from there to the very dock where the vessel was moored were of necessity an unknown quantity to the master, as was the likelihood of the wind continuing in the direction it was then moderately blowing as factors in preventing the spread of the fire or of its drawing towards or away from the vessel. The next day, after the danger was over, the relation of all these matters and their bearing on the question of danger were readily ascertainable, but not so the evening before, the very time that prudence demanded immediate action as well as thought.

The master's desire to be moved away from what then appeared to him to be a perilous position, was founded in the highest prudence, and the service rendered him by the steam tug in moving him out of reach of the fire wheresoever it might extend, was salvage, and not towage, unless, as contended by claimant, an express contract was made that the assistance rendered was to be towage. There is a dispute between the masters of these vessels as to what occurred between them on the arrival of the tug. The master of the steamship testified that as the tug approached "the Garfield captain said: 'Mate, do you want any assistance?' He told me that he was Mc-Caldin, and doing our towing, and I agreed with him for him to take a line and pull me into the stream and anchor. Then I gave the second officer orders to give him a line;" and that that was all the conversation "until he came on the bridge again." The captain of the tug said that as he got to the pier the master of the steamship "hollered" to him, and "he insisted on me pulling the ship out and putting a line down. He put a line down and I got the line, and after it was halfway out a boat called the Florence came there. * * * He said he knew it was a salvage ship, and he didn't want anything to happen to the ship there, and he didn't care how much it cost."

[3] Where, as in this case, the nature of the service rendered is salvage, the burden of proof is on him who alleges otherwise. Elphicke v. White Line Towing Co., 106 Fed. 945, 46 C. C. A. 56. "To displace a claim for salvage it is necessary that parties who seek the protection of any other rule of compensation should plead and prove a binding contract that the work done shall be paid for at all events." The Apache (C. C.) 124 Fed. 907. The testimony of the master of the steamship can hardly be said to support the contention of claimant that it was agreed between the parties that the services to be rendered were towage. Such testimony is not inconsistent with the idea that salvage services were to be rendered; but, if it were, it does not overcome the direct testimony of libelants to the contrary.

After careful consideration, and giving due weight to the probabilities, I am of the opinion that the claimant has failed to establish that the services were to be compensated as towage, and that such are to be treated as salvage. That no loss would have been sustained by the steamship had it remained at the pier, that no injury resulted to the steam tug in the services rendered, that no real danger attended the crew of the steam tug during the rendition of such service, that but little time was consumed in the moving of the steamship from the pier to its anchorage up the stream, does not affect the character of the services, and change it from salvage to towage.

[4] These considerations, however, are influential on the amount of compensation to be awarded. The services being in the nature of salvage, the crew could not be deprived of the bonus which the law gives for such services simply because the owner of the tug made a settlement with the claimant for the services so rendered. The policy of the law is to reward not only the vessel, but also and particularly the persons who risk limb and perhaps life in rendering salvage services, and, while the owner of the vessel may settle for the vessel's share in the services rendered, he cannot exclude the crew from obtaining theirs. Salvage goes beyond quantum meruit, and personal services rendered in salvage are not under the control of the owner of the vessel. The Cetewayo (D. C.) 7 Fed. 128; Ben. Adm. (4th Ed.) § 324; The J. C. Pfluger (D. C.) 109 Fed. 93, 96; The New Orleans (C. C.) 23 Fed. 909; Compagnie Commerciale de Transport, etc., v. Charente S. S. Co., 60 Fed. 921, 9 C. C. A. 292.

Nor is the award limited to the value of the property actually saved. Such a limitation would run counter to the law's policy, and minimize, if it did not destroy, the stimulus which it seeks to engender by granting a bonus to those who, amidst a reasonably apprehended, as well as actual, danger, go promptly to the rescue. The Apache, supra; The D. L. & W. No. 6 C. (D. C.) 53 Fed. 284. The salvor is not expected to wait until after he has carefully weighed the probability of there being actual danger to life or property, before he proceeds to the rescue, but to go instantly; for within the principle as well as the policy underlying salvage, is the need of availing one's self of every minute to make the succor efficient. In such matters every minute counts, and may count with tremendous effect. The difference between a total loss of both life and property and a successful saving of both, may often be measured by minutes. That the salvor often over-magnifies the danger and the importance of his work is true; but not any more so than the underestimating of the need or efficacy of the salvage by the beneficiary. Both are often due to cupidity which will not escape the attention of the court in fixing the award.

[5] The present case is one of salvage, though not of a high order, and not one that calls for a large reward. The owner of the tug having made settlement with the claimant for the vessel's share in the services rendered, the court is called upon only to make allowance to the captain and crew. In doing this, however, the vessel's part will have to be considered—that its share, usually a large one—be eliminated from the award. The time during which the serv-

ices lasted was less than an hour, and no loss of pay and no injuries were sustained by libelants. Their services, however, were voluntarily performed with dispatch and efficiency, and in the circumstances were seemingly necessary, and in the presence of apparent danger.

On the facts of this case, an award of $600 is deemed to be reasonable, to be divided one-third to the captain because of his superior skill and responsibility, and the remainder among the other four libelants, in proportion to the rate of wages paid to them, respectively.

As to the costs. These should be borne by claimant, notwithstanding libelants' somewhat exaggerated notion of the value of their services and of the helplessness of the steamship, as alleged in their libel, and their exaction of a $5,000 bond. Claimant made no effort to have the amount of the bond reduced; on the contrary, it seems to have acquiesced in the amount required. Nor did it make any effort to settle with the master and crew of the tug—the direct actors in the salvage service—but, on the contrary, it sought to absolve itself from any liability to the crew by dealing directly with the owner of the tug that did the towing of the steamship in the waters of New York Harbor, and with whom it succeeded in making a settlement on the basis of towage. This settlement, however, as herein found, cannot cover the crew's salvage services. The Indianna (D. C.) 22 Fed. 925; The Straits of Gibraltar (D. C.) 32 Fed. 297.

The case is devoid of any suggestion that the claimant was either harrassed or embarrassed by the conduct of libelants, and they should have their costs.